**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Harry SEIDMAN, Defendant–Appellant.**

**No. 97–4075.**

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 30, 1998.

Decided Sept. 9, 1998.

---

**ARGUED:** Mark J. Biros, Proskauer Rose, L.L.P., Washington, DC, for Appellant. Ira Lee Oring, Asst. U.S. Atty., Baltimore, MD, for Appellee. **ON BRIEF:** Alec W.

Farr, Proskauer Rose, L.L.P., Washington, DC, for Appellant. Lynne A. Battaglia, U.S. Atty., Baltimore, MD, for Appellee.

Before WILLIAMS and MICHAEL, Circuit Judges, and KISER, Senior United States District Judge for the Western District of Virginia, sitting by designation.

Affirmed by published opinion. Judge WILLIAMS wrote the opinion. Judge MICHAEL wrote a separate opinion concurring in parts I, II and IV and the judgment. Senior Judge KISER wrote a separate opinion concurring in part and dissenting in part.

## OPINION

WILLIAMS, Circuit Judge:

Harry Seidman was convicted on September 26, 1997, on one count of conspiracy to embezzle funds from a labor union, *see* 18 U.S.C.A. § 371 (West Supp.1998) and 29 U.S.C.A. § 501(c) (West 1985), and on twelve counts of embezzlement from a labor union, *see* 29 U.S.C.A. § 501(c) (West 1985), or aiding and abetting the same, *see* 18 U.S.C.A. § 2 (West 1969). The district court sentenced Seidman to thirty-nine months imprisonment on each count, the sentences to run concurrently, and imposed a fine of $30,000. Seidman appeals his convictions on two grounds: (1) that the district court erred in denying his motion to suppress a tape-recorded conversation; and (2) that the district court's instructions on 18 U.S.C.A. § 2 were improper. Because we conclude that the district court properly denied the suppression motion and correctly instructed the jury on aiding and abetting, we affirm Seidman's convictions.

## I.

Seidman was employed by the International Organization of Masters, Mates, and Pilots (the Union), a labor union headquartered in Linthicum, Maryland,[1] from the 1950s until December of 1993. Seidman eventually became the Comptroller for the Union. His responsibilities as Comptroller included paying the Union's bills, administering the Union office on a day-to-day basis, and obtaining annual financial audits. Seidman was personally authorized to sign checks on the Union's behalf. Although the Secretary/Treasurer, James T. Hopkins, Jr., was the chief financial officer of the Union, a major portion of the Secretary/Treasurer's time was devoted to handling contract grievances for Union members. The Secretary/Treasurer did not review invoices submitted to the Union or checks signed by Seidman on behalf of the Union.

When Timothy Brown became President of the Union in April of 1991, the Union was in poor financial condition. In 1992, Seidman informed Brown that Seidman had cashed the last of the Union's cash reserves which had been held in million dollar certificates of deposit. Approximately five to six percent of the Union's total expenditures, or $30,000 a month, were incurred by the Union-published monthly newspaper. In the fall of 1992, Brown decided to print the newspaper on a bimonthly basis to reduce costs.

Ronald Schoop was an independent contractor who provided printing services to the Union through the corporate entity "Mercury Graphics" from approximately 1978 to October 1993. Initially, Schoop provided general printing services, including business cards, envelopes, and wall calendars. During 1985, Schoop began printing the Union newspaper. In October of 1993, Schoop briefly became an employee of the Union until his resignation in December of 1993 when a scheme of embezzlement between Seidman and Schoop was discovered.[2] Schoop had an office located in the Union headquarters, but no printing services were actually performed at the Union office. To obtain payment for his printing services, Schoop submitted bills to the Union which were paid by Seidman. In late May of 1993, Beverly Gutmann, the Un-

---

1. During some of the relevant events underlying this action, the Union office was located in New York City. The Union office was moved to Maryland sometime in 1984 or 1985.

2. Schoop was placed on the Union payroll to reduce the cost of the Union newspaper and to bring the Union into compliance with guidelines regarding the status of employees and independent contractors.

ion's Assistant Comptroller, informed Brown that there had been a potential double billing for the Union newspaper. Brown questioned Seidman about the possible double billing, and Seidman responded that the additional charges were for editorial changes that Brown had made in a recent issue of the paper. Brown did not question Seidman's answer because he had substantially rewritten large sections of that edition of the paper.

When Brown later inquired about the expenses associated with producing the newspaper during the summer of 1993, Seidman responded that the cost of the newspaper had not decreased even though the paper was being published bimonthly instead of monthly. Brown was not satisfied with Seidman's explanation of the expenses associated with publishing the newspaper. He became even more suspicious in November of 1993 when Gutmann approached him again about double charges for Schoop's printing services for the December 1992/January 1993, February/March 1993, and May/June 1993 editions of the Union newspaper. Gutmann told Brown that she believed Seidman and Schoop were embezzling funds from the Union.

Because of these mounting suspicions of financial impropriety, Brown hired an outside forensic auditor, Gunther Borris, to perform an audit. On December 24, 1993, Borris met Brown and Hopkins, the Secretary/Treasurer, at the Union office. Borris spent the entire day reviewing the Union's financial records, particularly the potential double billings for the Union newspaper. As a result of Borris' investigation, Brown learned for the first time that checks had been issued to Ronald Schoop personally for invoices submitted by Mercury Graphics and that 1099 forms had not been issued to Schoop.[3] Bor-

ris also confirmed that there had been at least two double billings for the Union newspaper.

On December 28, 1993, Borris submitted his financial report at a meeting of the International Subcommittee, a group of five individuals charged with managing the affairs of the Union during time peri ods between meetings of the General Executive Board. During the meeting, Seidman and Schoop were questioned about the allegations of double billings. As a result of Borris' audit and the December 28 meeting, the Subcommittee asked Seidman for his resignation. Seidman signed a resignation letter on December 28, 1993. Ronald Schoop, who was at that time a salaried employee of the Union, resigned one day later.

In March of 1995, Schoop confessed to agents of the Department of Labor's Office of Labor Racketeering to conspiring with Seidman to embezzle funds from the Union and agreed to participate as a government informant. In that capacity, Schoop made two recorded telephone calls to Seidman, on March 9, 1995, and March 21, 1995. Schoop agreed to go to Seidman's residence wearing an electronic recording device and record a conversation with Seidman on May 23, 1995. Upon arriving at Seidman's residence, Schoop knocked on Seidman's door approximately ninety times. When he received no answer, Schoop opened the unlocked door and saw Seidman in the hallway near the door. When Schoop asked Seidman what he was doing, Seidman responded that he had been riding his exercise bicycle in the basement and closed the door to the basement, as if he had just come upstairs. Seidman led Schoop to the kitchen where the two proceeded to have a conversation for the next forty-five minutes.[4]

---

**3.** Persons engaged in a trade or business who make payments of more than $600 annually to an individual of "rent, salaries, wages, premiums, annuities, compensations, remunerations, emoluments, or other fixed or determinable gains, profits, and income" are required to make informational returns, commonly referred to as "1099 forms" to the Secretary of the Internal Revenue Service setting forth the amount of the income. *See* 26 U.S.C.A. § 6041(a) (West Supp. 1998). Beverly Gutmann testified at trial that the Union typically accounted for payments made to individuals other than salaried employ-

ees by the issuance of 1099 forms. Gutmann further testified that Seidman instructed Gutmann not to issue a 1099 form for Schoop for the money paid to him personally. John Gorman, who succeeded Seidman as Comptroller for the Union, testified that upon learning that no 1099 forms had been issued to Schoop, they were then issued and filed with the IRS.

**4.** The tape-recorded conversation between Seidman and Schoop related to Schoop's tax dilemma, Union business, and Schoop's and Seidman's personal lives. Although Seidman did not

### II.

On May 14, 1996, Seidman was charged in a thirteen count indictment with one count of conspiracy to embezzle funds from a labor union and twelve counts of embezzlement from a labor union or aiding and abetting the same. The indictment alleged that Seidman conspired with Schoop from approximately 1987 to July 1993 to embezzle approximately $800,000 in a complicated kickback scheme by "directing" or "causing" Schoop to submit fraudulent invoices for services from Mercury Graphics and other corporate entities.

A two-week trial was held in September of 1996. Schoop testified that he and Seidman participated in a kickback scheme.[5] Schoop testified that he submitted fraudulent invoices to the Union from his corporation, Mercury Graphics, and that Seidman issued checks on the Union's checking account to Schoop personally.[6] Schoop explained that he cashed the checks and gave approximately eighty percent of the proceeds to Seidman. Schoop also testified that he gave Seidman and his family gifts and made payments for expenses incurred by Seidman and his fami-

explicitly confess to participation in a scheme to embezzle funds from the Union, his responses to Schoop's questions, and his failure to respond in some instances, supported and corroborated the testimony of the government's witnesses and the government's documentary evidence. The contents of the taped conversation in pertinent part follow:

> Schoop: Well, this is your problem too. Are you going to help me?
> Seidman: I wish—I don't know. All I can tell you is in fact, tell Jeff [referring to Schoop's accountant].
> Schoop: If I told Jeff everything, then it would incriminate you and me.
> Seidman: I would give them this and tell him, "Do what you have to."—
> Schoop: I don't know.—I'm sick, Harry.
> Seidman: I understand that.—Believe me, I understand that.
> . . .
> Schoop: What do you want me to tell them?
> Seidman: I received these ten [..] [referring to 1099 forms], "Here's a letter".—
> Schoop: No, no, no, I'm talking about when the Feds come back 'cause I'm sure they will.
> Seidman: Tell them the truth.—
> Schoop: Tell them the truth? I mean, both of us are in trouble . . .

(J.A. at 97.)

> Schoop: Well, whatever it is on this thing here, I expect you to pay for it 'cause I ain't gonna to pay for it. I don't have it to begin with. If I had it, bub, I'd do it. I'd pay it. But I don't have it. I've been putting this off and putting it off. Every day I look at it, and I get sick.
> . . .
> Schoop: I counted it up. I gave you almost a million dollars. Do you know that? And you're living over here. (Laughing.)
> . . .
> Schoop: What are you going to do? Are you going to stay here?
> Schoop: You don't know?
> Schoop: Huh?

> Seidman: I don't—I'm not sure what my plans are in the future.

(J.A. at 105.)

> Schoop: You know, you tell me to tell the truth. I tell the truth to them, both of us are in trouble. Is that what you want me to do?
> Seidman: Tell the truth.

(J.A. at 110.)

> Schoop: Yeah, send it to him, but there's no record that, ah, you know—how in the hell can I prove that I gave you the money? I can't do it.
> . . .
> Seidman: But any liability may not be as high as you think it is . . . . My guess is you're going to work it out with the IRS.
> Schoop: It's a lot of money, Harry. That bullshit thing you gave me with the two-sixty-five doesn't even come nowhere near it.

(J.A. at 116–17.)

5.  Schoop pleaded guilty to conspiracy to embezzle funds from the Union. Schoop received a two-level downward departure under the U.S. Sentencing Guidelines as a result of his willingness to testify at Seidman's trial.

6.  Schoop "broke down" his bills for printing into legitimate invoices for the cost of the actual printing services provided by his corporation, Mercury Graphics, and fraudulent invoices for "typesetting" services that he never performed. In accordance with the invoices, checks for the legitimate services were made payable to Mercury Graphics, while the checks for typesetting were made payable to Schoop personally. Schoop cashed the checks made payable to him personally for typesetting services and provided most of the cash to Seidman.

    Schoop also submitted duplicative invoices for printing services for the newspaper and other items, such as the Union constitution. For example, Schoop submitted two invoices in February of 1993 (one for printing and one for typesetting) for the February/March issue of the newspaper. Schoop then submitted duplicate invoices in March of 1993 for the same issue.

ly. The Government contended that the gifts and payments were part of the kickback scheme.

Seidman's version of events was that he received gifts and payments from Schoop because he and Schoop were close friends for many years. Seidman also claimed that Schoop gave him cash to be held in trust for Schoop's son because Schoop was addicted to gambling and alcohol. In a letter to Schoop dated March 21, 1994, Seidman stated that he was returning the money to Schoop because Seidman had retired from the Union: "I am returning to you all the assets you entrusted to me, including all interest earned thereon." (J.A. at 1046.) In conjunction with the letter, Seidman gave Schoop a check for $265,000.00. At Seidman's request, Schoop signed the March 21 letter. Schoop also accepted and cashed the check for $265,-000.00. Schoop testified at trial, however, that he was shocked when Seidman gave him the money and that he had never asked Seidman to hold any money in trust for him.

The jury found Seidman guilty on all thirteen counts of the indictment. Seidman appeals his conviction, arguing that the district court erred in denying his motion to suppress the tape-recorded conversation and that a portion of the district court's jury instructions constituted reversible error. We address each argument in turn.

### III.

On appeal, Seidman first claims that Schoop, acting as a government agent, entered his home illegally. As a result, Seidman contends that the recorded conversation obtained by Schoop was the tainted fruit of the illegal entry and should have been suppressed. Even assuming, without deciding, that there was an illegal entry, we conclude that the ensuing conversation between Seidman and Schoop was sufficiently independent of the unlawful invasion to purge any taint arising from the initial entry. Therefore, we hold that the district court did not err in denying Seidman's motion to suppress.

We review legal conclusions made pursuant to a district court's suppression determination de novo, but review the underlying factual findings for clear error. See *United States v. McDonald,* 61 F.3d 248, 254 (4th Cir.1995). We construe the evidence in the light most favorable to the Government, the prevailing party below. See *United States v. Elie,* 111 F.3d 1135, 1140 (4th Cir. 1997) (citing *United States v. Han,* 74 F.3d 537, 540 (4th Cir.), *cert. denied,* 517 U.S. 1239, 116 S.Ct. 1890, 135 L.Ed.2d 184 (1996)).

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" by the government or its agents. U.S. Const. amend. IV; *see also United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). During the suppression hearing on August 30, 1996, the Government conceded that Schoop was acting as a government agent when he went to Seidman's home.[7] Thus, Schoop's conduct violated the Fourth Amendment if it constituted an unreasonable search or seizure. See *Jacobsen,* 466 U.S. at 113, 104 S.Ct. 1652; *United States v. Taylor,* 90 F.3d 903, 908 (4th Cir. 1996). "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *Jacobsen,* 466 U.S. at 113, 104 S.Ct. 1652. It is well established that a search conducted without a warrant is "*per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *see also Wilson v. Layne,* 141 F.3d 111, 1998 WL 159673 (4th Cir. April 8, 1998) (en banc) (noting that entry into a home without a warrant is per se unreasonable unless an exception to the warrant requirement exists). The district court concluded that Schoop's action of opening Seidman's unlocked door and stepping inside, without a warrant, was an unreasonable infringement on Seidman's

---

**7.** Although we are not bound by the Government's concession, *see United States v. Stanfield,* 109 F.3d 976, 984 n. 5 (4th Cir.), *cert. denied,* ——— U.S. ———, 118 S.Ct. 156, 139 L.Ed.2d 101 (1997),

we agree that the evidence demonstrated that Schoop was acting as a government informant when he went to Seidman's home.

privacy and thus constituted a search in violation of the Fourth Amendment.

The district court, nevertheless, denied Seidman's motion to suppress the recorded conversation. The district court concluded that it was irrelevant whether Schoop stepped inside Seidman's house without express invitation because Seidman voluntarily consented to the ensuing conversation. The district court determined that Seidman's consent to the conversation was manifested by Seidman's attempt to create the appearance that, out of politeness to Schoop, he had not heard Schoop's knocks.[8] According to the district court, Seidman also manifested his consent to the conversation by never asking Schoop to leave and by speaking to Schoop at length about various topics including family relations and their personal lives. Moreover, the district court noted that Schoop never acted in a threatening or hostile manner toward Seidman, so Seidman was not coerced into the conversation.

■ "[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). If the Government has committed a constitutional violation, however, evidence obtained as a result of the violation cannot be used unless the connection between the unlawful conduct and the acquisition of the evidence has "become so attenuated as to dissipate the taint." *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939). Because the district court concluded that Schoop entered Seidman's residence in violation of the Fourth Amendment, it was required to apply a "tainted fruit" analysis to determine whether the taint of the illegal entry was purged. *See Wong Sun v. United States*, 371 U.S. 471, 486–88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The district court erred in simply

concluding that Seidman's subsequent consent rendered the tape-recorded conversation admissible. Rather, the district court should have determined whether the taint arising from the unlawful entry was sufficiently attenuated by the consent.[9]

■ As a general rule, evidence obtained as a result of a Fourth Amendment violation is inadmissible. *See id.* at 484–85, 83 S.Ct. 407. This broad exclusionary prohibition extends to verbal evidence as well as physical evidence. *See id.* In *Wong Sun*, however, the Supreme Court noted that an intervening "act of free will [may] purge the primary taint of the unlawful invasion." *Id.* at 486, 83 S.Ct. 407. Factors relevant to the inquiry include: (1) the amount of time between the illegal action and the acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. *See Brown v. Illinois*, 422 U.S. 590, 603–04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). Nevertheless, "a finding with respect to attenuation … can only be made after consideration of all the circumstances of the case." *United States v. Wellins*, 654 F.2d 550, 554 (9th Cir.1981) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 248–49, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). This requires a "careful sifting of the unique facts and circumstances of each case." *Schneckloth* 412 U.S. at 233, 93 S.Ct. 2041. Finally, "[t]he burden of showing admissibility rests … on the prosecution." *Id.* at 604, 95 S.Ct. 2254. Although the district court did not engage in an inquiry as to whether the taint of the illegal entry had been purged, the district court's factual findings transcribed at the suppression hearing and the May 23 tape recording are sufficient for us to make such a determination, so that remand is not necessary. *See id.* at 604, 95 S.Ct. 2254.

---

8. Seidman told Schoop that he had not heard Schoop knocking because he was in the basement riding his exercise bike. The clear suggestion is that had Seidman heard the knocking, he would have let Schoop in.

9. The district court's finding that Seidman consented to the ensuing conversation with Schoop

and that the tape-recorded conversation was therefore admissible was tantamount to a finding that the taint of the illegal entry was purged. The district court, however, did not explicitly apply the analysis set forth in *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), and *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

For purposes of this appeal, we will assume, without deciding, that Schoop's entry into Seidman's home was violative of the Fourth Amendment. With that having been said, we note that the brief intrusion into Seidman's home was at worst a minor and technical invasion of Seidman's rights. Indeed, unlike the cases cited by the concurrence, Seidman was neither arrested without probable cause, nor involuntarily transported to the police station and interrogated in the hope that something would turn up. *See Taylor v. Alabama*, 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982); *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *People v. Gonzalez*, 64 Cal.App.4th 432, 75 Cal.Rptr.2d 272 (1998). Nor, for that matter, was Seidman present when incriminating evidence was found in an illegal search of his home or confronted by the police with incriminating evidence that they had illegally seized. In fact, this case lacks the element of overt police coercion that exists in every case cited by the concurrence. *See Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *Johnson v. Louisiana*, 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972); *United States v. Gooding*, 695 F.2d 78 (4th Cir.1982); *United States v. Wellins*, 654 F.2d 550 (9th Cir.1981). As a result, the taint that must be purged here is, at best, slight.

Applying the analysis developed in *Wong Sun* and its progeny, we determine that the taint of the illegal entry had been purged, and, therefore, the tape-recorded conversation of May 23, 1995, was properly admitted at trial. As to the first factor, we recognize

that very little time elapsed between Schoop's entry and the conversation regarding Schoop's tax dilemma. Approximately one minute after he entered, Schoop stated, "What are we going to do about this, bub?" (J.A. at 83) referring to his unpaid taxes. Despite the concurrence's contentions to the contrary, the lack of a significant intervening period of time does not require that the tape recording in question be suppressed for want of sufficient attenuation. *See United States v. Rodriguez*, 585 F.2d 1234, 1239, 1242 (5th Cir.1978). Indeed, "the *Brown* test does not require that each of the factors set forth be resolved in favor of the Government." *United States v. Wellins*, 654 F.2d 550, 554 (9th Cir.1981). Here, the second and third factors weigh strongly in favor of admissibility.

As to the second factor, we conclude that Seidman's actions toward Schoop after Schoop's entry constitute intervening circumstances. Almost immediately after Schoop entered the home, any taint arising from Schoop's entry was attenuated by Seidman's consent to the conversation.[10] Shortly after Schoop opened the door to Seidman's house, Seidman shut the front door behind Schoop, and Seidman motioned him into the kitchen. These intervening acts indicated Seidman's willingness to engage in a conversation with Schoop. More importantly, shutting the door behind Schoop and motioning him into the kitchen were independent acts of free will by Seidman. For the following forty-five minutes, Seidman and Schoop engaged in a conversation in Seidman's kitchen, regarding their families, personal lives, Union business, and Schoop's tax dilemma. Seidman never asked Schoop to leave.

---

10. By focusing on Seidman's subsequent consent to the conversation, the concurrence suggests that we have "confused the Fifth Amendment voluntariness analysis with *Brown*'s distinct Fourth Amendment attenuation analysis." *See post* at 22. We disagree. The proper test, which we have applied, is whether a statement made subsequent to a Fourth Amendment violation is "sufficiently an act of free will to purge the primary taint." *Brown v. Illinois*, 422 U.S. 590, 602, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (citing *Wong Sun v. United States*, 371 U.S. 471, 486, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)). Consent has often been recognized as sufficient to waive Fourth Amendment rights. *See Schneckloth v.*

*Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). We see no reason why it could not also sever the connection between an unlawful act and the acquisition of additional evidence. Indeed, voluntary consent is the quintessential act of free will. *See United States v. Dickson*, 64 F.3d 409, 410–11 (8th Cir.1995) (holding that defendant's independent and voluntary consent to search his apartment dissipated taint of prior illegal search); *United States v. Sheppard*, 901 F.2d 1230, 1234 (5th Cir.1990) (holding that defendant's voluntary consent to search his car dissipated taint of officer's illegal entry).

The third factor also weighs against suppression. As noted above, the flagrancy and offensiveness of the governmental misconduct in this case pales in comparison to other cases where evidence has been held inadmissible on Fourth Amendment grounds. In *Wong Sun*, six or seven officers went to the business of James Toy, a man alleged to have sold heroin, broke open his door, followed him into his bedroom, and almost immediately handcuffed and arrested him. *Wong Sun*, 371 U.S. at 474, 486, 83 S.Ct. 407. The Supreme Court held that Toy's statements to the officers shortly thereafter were inadmissible because it was unreasonable to infer that the statements were an act of free will under the circumstances. *Id.* at 486, 83 S.Ct. 407. Similarly, in *Brown*, police officers broke into Brown's apartment and searched it without probable cause and without a warrant. *See Brown*, 422 U.S. at 592, 95 S.Ct. 2254. Brown was returning to his apartment when a police officer pointed a revolver at him and told him he was under arrest. *See id.* Brown subsequently was held at gunpoint and searched. *See id.* at 593, 95 S.Ct. 2254. The degree of coercion resulting from the police officers' illegal acts in *Wong Sun* and *Brown v. Illinois* simply was not present here. According to Seidman's own testimony, he and Schoop had been friends for many years. In fact, Schoop's visit to Seidman's house that day was not entirely unexpected. In a recorded telephone conversation on March 21, 1995, the two had discussed potentially meeting in person in Columbia, Maryland, where Seidman resided, instead of Baltimore, Maryland, where Schoop worked and resided. As the district court noted, Schoop never made any threats to Seidman or exerted any force towards him. Seidman now claims on appeal that he did not ask Schoop to leave because Schoop intimidated him.[11] In a slightly different context, however, we have noted that "[s]ubsequent testimony by

an accused about his prior subjective mental impressions and reactions must be carefully scrutinized, as such testimony is always influenced by [his] self-interest." *United States v. Braxton*, 112 F.3d 777, 781 (4th Cir.) (en banc) (holding statement to police officers was voluntary under the Fifth Amendment in view of totality of circumstances) (internal quotation marks omitted), *cert. denied*, ——— U.S. ———, 118 S.Ct. 192, 139 L.Ed.2d 130 (1997). With the exception of Seidman's own testimony, there is simply no evidence to suggest that Schoop intimidated Seidman.

Considering all of the factors set forth by the Supreme Court in *Brown v. Illinois*, and the unique circumstances of this case, we conclude that the admission of the May 23 tape-recording at trial did not abridge Seidman's Fourth Amendment guarantee of freedom from an unreasonable search and seizure. Even though the time span between the unlawful entry and Seidman's consent was short, we cannot say that Seidman's statements resulted from the exploitation of the unlawful entry. Rather, we conclude that the taint arising from the initial entry was purged by the intervening independent acts of Seidman shutting the door behind Schoop, motioning Schoop into his kitchen, and engaging Schoop in conversation for a substantial period of time. Seidman acted voluntarily, without coercion or threat of force from Schoop. Therefore, we conclude that the May 23 tape-recording was properly admitted by the district court.

## IV.

■ Next, Seidman argues that his convictions on Counts two through thirteen of the indictment must be vacated because the district court's instructions on 18 U.S.C.A. § 2 (West 1969) were improper. Specifically, Seidman contends that Schoop, as a matter of law, could not have been convicted of

---

11. Seidman testified at the suppression hearing, however, as follows:

Q. And it wasn't once during the course of this conversation that you asked him to leave?

A. That is correct, sir.

(J.A. at 264.)

Q. Did Mr. Schoop threaten you during the course of this conversation?

A. No, sir.

Q. Did he shout at you during the course of this conversation?

A. No, sir.

Q. Did he make a threatening physical motion at you?

A. No, sir.

(J.A. at 265–66.)

violating 29 U.S.C.A. § 501(c) (West 1985). Thus, Seidman claims that the district court erred in instructing the jury that it could find him guilty under § 2 if it found that he aided and abetted Schoop in violating § 501(c). "Both the decision to give (or not to give) a jury instruction and the content of an instruction are reviewed for abuse of discretion." *United States v. Russell,* 971 F.2d 1098, 1107 (4th Cir.1992). If, however, Schoop, as a matter of law, could not have been convicted of violating § 501(c), the district court did abuse its discretion in instructing the jury. *See Koon v. United States,* 518 U.S. 81, 100, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) (noting that "[a] district court by definition abuses its discretion when it makes an error of law").

■ Counts two through thirteen of the indictment charged Seidman with embezzlement from a labor union in violation of 29 U.S.C.A. § 501(c) or aiding and abetting the same in violation of 18 U.S.C.A. § 2. When a jury has been instructed on two legal theories, one of which is legally inadequate, the conviction must be reversed if it is not possible to determine whether the jury convicted on the legally adequate, or inadequate, theory. *See Yates v. United States,* 354 U.S. 298, 312, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957); *cf. Griffin v. United States,* 502 U.S. 46, 56–60, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991) (explaining that when a case is submitted to a jury on two adequate legal theories and the jury returns a general verdict of guilty, affirmance is appropriate so long as the evidence is sufficient to support a conviction on either theory). Because the jury returned a general verdict of guilty, it is not possible to determine whether Seidman's convictions were based on the theory that he violated 29 U.S.C.A. § 501(c) or on the theory that he violated 18 U.S.C.A. § 2. Seidman concedes that § 501(c) provides a legally adequate ground for his convictions. Thus, this case turns on whether § 2 provides a legally adequate ground for Seidman's convictions.

■ Section 2 provides:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

18 U.S.C.A. § 2. The district court charged the jury that it could find Seidman guilty as a principal under § 2(a) if it found "beyond a reasonable doubt that the government has proved that another person actually committed the offense with which the defendant was charged and that the defendant aided or abetted that person in the commission of the offense." As a result, the district court instructed the jury that it must first

find that another person, Mr. Schoop, has committed the crime charged, the embezzlement alleged in the substantive count. Obviously, no one can be convicted of aiding and abetting the criminal acts of another if no crime was committed by the other person in the first place so, therefore, if Mr. Schoop did not commit the embezzlements charged in 2 through 13 then Mr. Seidman could not be convicted of aiding and abetting Mr. Schoop.

(J.A. at 1016.)

The crime charged in the substantive count was 29 U.S.C.A. § 501. That section provides:

Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use, or the use of another, any of the moneys, funds, securities, property, or other assets of a labor organization of which he is an officer, *or by which he is employed,* directly or indirectly, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

29 U.S.C.A. § 501(c) (emphasis added). Section 501, by its own terms, only applies to persons "employed" by the Union. Seidman claims that Schoop was not an employee of the Union. Accordingly, Seidman contends that Schoop could not have been convicted of violating § 501. Following this line of reasoning (*i.e.,* Schoop could not have been convicted of embezzlement from a labor union), Seidman argues that he could not have been convicted of aiding and abetting embezzlement in violation of 18 U.S.C.A. § 2.

Whether § 2 provides a legally adequate ground for Seidman's convictions turns on whether Schoop was employed by the Union within the meaning of § 501(c). Despite Seidman's contentions to the contrary, we conclude that Schoop was so employed during the entire time period covered by the indictment.[12] An individual has the requisite status to be convicted under § 501(c) if "he is employed, directly or indirectly," by a labor organization. *See* 29 U.S.C.A. § 501(c). It was clearly established at trial that Schoop provided printing services to the Union during the entire time period covered by the indictment. *Cf. United States v. Lawton*, 995 F.2d 290, 294–95 (D.C.Cir.1993) (holding individual could not have embezzled pursuant to § 501(c) where relationship to International union was not clearly established at trial). We have little difficulty concluding that a contractor hired to perform printing services is *indirectly* employed by the Union.[13] *Cf. United States v. Capanegro*, 576 F.2d 973, 976 (2d Cir.1978) (holding that an attorney who provided legal services primarily to individual union members was employed by the union). In so holding, we recognize that the common law definition of "employee" does not include independent contractors. *See, e.g., Baker v. Texas & Pacific Ry. Co.*, 359 U.S. 227, 79 S.Ct. 664, 3 L.Ed.2d 756 (1959); *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 728–29, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947). Indeed, the definition of employee in 29 U.S.C.A. § 152(3) (West 1973) expressly excludes independent contractors. Here, however, Congress chose not to use the word "employee" in § 501(c). *See Morissette v. United States*, 342 U.S. 246, 263, 72 S.Ct. 240, 96 L.Ed. 288 (1952) (noting that when Congress uses a term of art it presumably knows and adopts the meaning attached to the word). Instead, Congress applied § 501(c) to "any person" who embezzles or steals from a labor organization "by which he is employed, directly or indirectly." We believe that the aforementioned language is broad enough to include independent contractors like Schoop.[14]

Because we conclude that Schoop could be convicted under § 501(c), it necessarily follows that Seidman could also be convicted under § 2 for aiding and abetting Schoop. Accordingly, we hold that Seidman's convictions do not require reversal under *Yates*.[15]

**12.** In its brief, the Government has conceded that Schoop was not an employee of the Union. Notwithstanding the Government's concession, we may conduct our own review of the issue. *See Sibron v. New York*, 392 U.S. 40, 58, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968) (noting that "[i]t is the uniform practice of this Court to conduct its own examination of the record in cases where the ... Government ... confesses [error]"); *Young v. United States*, 315 U.S. 257, 258, 62 S.Ct. 510, 86 L.Ed. 832 (1942) (noting that concessions of error do not "relieve this Court of the performance of the judicial function"); *United States v. Stanfield*, 109 F.3d 976, 984 n. 5 (4th Cir.1997) (refusing to reverse defendant's conviction despite Government's concession of error), *cert. denied*, —— U.S. ——, 118 S.Ct. 156, 139 L.Ed.2d 101 (1997).

**13.** It is undisputed that Schoop was a salaried employee of the Union for three months, from October of 1993 through December of 1993. As such, Schoop was, at least for a time, directly employed by the Union. For reasons that are not entirely clear, however, the indictment covered only acts occurring between 1987 and July of 1993.

**14.** Even assuming that Schoop was not employed by the Union, Seidman could have been convicted as a principal pursuant to 18 U.S.C. § 2(b) if he willfully caused Schoop to perform acts which, if directly performed by Seidman, would be an offense against the United States. *See* 18 U.S.C.A. § 2(b) (West 1969). Thus, Seidman is simply incorrect in arguing that he could not be convicted under § 2 if Schoop could not be convicted under 29 U.S.C.A. § 501(c).

**15.** In instructing the jury on the elements of § 501(c), the district court defined the terms embezzlement, conversion, and theft. Of particular importance here, the district court instructed the jury that a person can embezzle funds only if he holds a position of trust. Although we readily conclude that Schoop was indirectly employed by the Union, we agree with Seidman that Schoop did not hold a position of trust. As a consequence, Schoop could not have embezzled funds from the Union.

In explaining the elements necessary to convict Seidman of aiding and abetting pursuant to 18 U.S.C.A. § 2, the district court erroneously stated that the jury must find that Schoop "committed the crime charged, the *embezzlement* alleged in the substantive count." (J.A. at 1016.) (emphasis added). Of course, a cursory review of the statutory language reveals that it was not necessary for the jury to find that Schoop embezzled the funds. The jury could convict Seidman of violating 18 U.S.C.A. § 2 by finding that Schoop con-

## V.

We conclude that the district court properly denied Seidman's motion to suppress the May 23, 1995, conversation at Seidman's residence. We also conclude that the district court's instruction on aiding and abetting was proper because Schoop was indirectly employed by the Union. Accordingly, we affirm Seidman's conviction on all counts.[16]

*AFFIRMED.*

MICHAEL, Circuit Judge, concurring in part and concurring in the judgment:

While I agree with the majority's conclusion that Seidman's conviction should be affirmed, I cannot join its reasoning on the admissibility of the tape of the May 23 conversation between Seidman and Schoop. In holding that tape to be admissible, the majority waters down the protections of the Fourth Amendment. Schoop pressed his way into Seidman's home in violation of the Fourth Amendment. In literally a minute's time Schoop was trying to ensnare Seidman into admissions of guilt. As a result, Seidman did not have a sufficient chance to consider his options and exercise his free will, and the taint of Schoop's unconstitutional entry was never purged. The majority's conclusion—that Seidman's nonresistance alone attenuated the taint of Schoop's illegal entry—in effect relies on Fifth Amendment voluntariness criteria to satisfy the stricter Fourth Amendment requirement that the government may not exploit an unconstitu-

tional incursion to obtain even a "voluntary" statement.

Nevertheless, because the inadmissible tape was merely cumulative and Seidman's guilt was established beyond a reasonable doubt, I would find the error to be harmless and affirm Seidman's conviction. Accordingly, I concur in the judgment, and I concur in parts I, II, and IV of the majority opinion.

## I.

The Fourth Amendment to the Constitution of the United States forbids government agents from conducting unreasonable searches and seizures. This prohibition is especially powerful when it comes to "protect[ing] the physical integrity of the home." *United States v. McCraw,* 920 F.2d 224, 230 (4th Cir.1990) (citations omitted). The majority recognizes that Schoop was acting as a government agent when he entered Seidman's home. *See ante* at 547 n. 7. Also, the majority *assumes* that by opening Seidman's closed front door and entering without permission or invitation, Schoop violated the Fourth Amendment. This assumption should be a firm conclusion. Schoop did not have a search warrant, and he had no legitimate reason to make an uninvited entry into Seidman's home. Schoop therefore committed a clear violation of the Fourth Amendment. *See United States v. Thomas,* 955 F.2d 207 (4th Cir.1992) (FBI agents violated Fourth Amendment by entering defendant's room without permission or warrant).

verted or stole the funds. *See* 28 U.S.C.A. § 501(c) (stating "[a]ny person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use, or the use of another" money or other assets from a labor union violates § 501(c)). Indeed, the district court had previously instructed the jury that a person violates § 501 by either embezzling, stealing, or converting funds. Schoop could not embezzle funds, but he certainly was capable of stealing or converting those funds. It is clear, therefore, that the district court simply used "embezzlement" as a short hand for describing all the acts prohibited by § 501(c). Although we do not consider the district court's instruction a model of clarity, we do not find it to be so harmful as to require reversal of the convictions. *See Johnson v. United States,* 520 U.S. 461, ——, 117 S.Ct. 1544, 1549, 137 L.Ed.2d 718 (1997) (stating that a misinstruction is "subject to harmless-error

analysis"). In particular, we conclude, "beyond a reasonable doubt, that a correctly instructed jury would have reached the same conclusion." *United States v. Hastings,* 134 F.3d 235, 241 (4th Cir.1998), *cert. denied* —— U.S. ——, 118 S.Ct. 1852, 140 L.Ed.2d 1100 (1998). The evidence that Schoop stole money from the labor Union was simply overwhelming.

**16.** Seidman also claims that because the district court's instruction on Counts two through thirteen of the Indictment—the object offenses of the conspiracy—was legally inadequate, his conspiracy conviction also rests upon legally inadequate grounds. Because we find that Seidman's convictions on the substantive counts of embezzlement in Counts two through thirteen were proper, we also conclude that Seidman's challenge to the conspiracy charge in Count one of the indictment fails.

When an agent obtains an incriminating statement on the heels of a Fourth Amendment violation, the government has a substantial burden in establishing admissibility. It is not enough for the government to show that the statement was voluntary under the Fifth Amendment. Rather, the government must also show that the statement was not obtained by exploitation of the Fourth Amendment violation. *See Brown v. Illinois,* 422 U.S. 590, 601, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). Because the government could not meet its burden here, what Seidman said to Schoop on the May 23 tape should have been excluded at trial.

### A.

Even if a confession made by a suspect following a Fourth Amendment violation is completely voluntary, the statement must be excluded unless the government can show that it was " 'sufficiently an act of free will to purge the primary taint.' " *Id.* at 602, 95 S.Ct. 2254 (quoting *Wong Sun v. United States,* 371 U.S. 471, 486, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)). This showing is completely separate from the Fifth Amendment requirement of voluntariness, and an otherwise voluntary statement must be excluded if the taint of the Fourth Amendment violation has not been purged. *See Taylor v. Alabama,* 457 U.S. 687, 690, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982) ("[T]his Court [has] firmly established that the fact that a confession may be 'voluntary' for purposes of the Fifth Amendment ... is not by itself sufficient to purge the taint of an illegal arrest. In this situation, a finding of 'voluntariness' for purposes of the Fifth Amendment is merely a threshold requirement for Fourth Amendment analysis" (citing *Dunaway v. New York,* 442 U.S. 200, 217, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979))). The Court has set out three factors that we must consider in determining whether the taint has been purged: "[1][t]he temporal proximity of the [illegal entry] and the confession, [2] the presence of intervening circumstances and, particularly, [3] the purpose and flagrancy of the official misconduct." *Brown* 422 U.S. at 603–04, 95 S.Ct. 2254 (citations and footnotes omitted). In *Brown,* because the suspect's statement was separated from his illegal arrest by less than two hours, there were no significant intervening events, and the arrest was for an improper purpose (investigation and questioning), the Court held that the suspect's statement was tainted by the illegal arrest and therefore inadmissible. *See id.* at 604–05, 95 S.Ct. 2254.

### B.

The majority purports to apply the *Brown* test to the events surrounding the May 23 conversation. As to the first *Brown* factor (proximity of Fourth Amendment violation to the statement), the majority recognizes that "very little time" (about a minute) elapsed between Schoop's entry and his first question to Seidman about wrongdoing. *See ante* at 549. The majority would apparently concede, as it must, that the first *Brown* factor weighs heavily against the government. Where the majority goes astray is in its analysis of the second and third *Brown* factors. There, the majority has confused the Fifth Amendment voluntariness analysis with *Brown*'s distinct Fourth Amendment attenuation analysis.

### 1.

The second *Brown* factor focuses on the presence of intervening circumstances. I cannot accept the majority's position that Seidman's apparent consent to talk with Schoop, as manifested by his acts of closing an open front door and motioning Schoop into the kitchen, is an intervening circumstance that assists in purging Schoop's blatant Fourth Amendment violation. The majority takes Seidman's acts of apparent consent, which would be relevant to a *Fifth* Amendment voluntariness inquiry, and attempts to transform them into a *Fourth* Amendment "intervening circumstance." *See ante* at 549 ("[A]ny taint arising from Schoop's entry was attenuated by Seidman's consent to the conversation"). This goes completely against the Supreme Court's consistent teaching that voluntary consent by itself is insufficient to purge the taint of a Fourth Amendment violation. It is also

contrary to the Court's interpretation of what constitutes an intervening circumstance in a taint attenuation context.

The inquiry to determine intervening circumstances under the Fourth Amendment is different from the one to determine voluntariness under the Fifth Amendment. An intervening circumstance (for Fourth Amendment purposes) is one that "contribute[s] to [the suspect's] ability to consider carefully and objectively his options and to exercise his free will." *Taylor*, 457 U.S. at 691, 102 S.Ct. 2664. In *Taylor* the defendant had been illegally arrested without a warrant. In the short period that followed, the police gave *Miranda* warnings to Taylor *three times*, obtained a written *Miranda* waiver from him, fingerprinted him, placed him in a lineup, and permitted him to speak briefly with his girlfriend and a male companion. The Court weighed all of these events, and held that not one of them, not even the *Miranda* waiver, was an intervening circumstance sufficient to "purge the taint of the illegal arrest." *Id.* at 690, 102 S.Ct. 2664; *see also Dunaway*, 442 U.S. at 218–19, 99 S.Ct. 2248 (finding no intervening circumstance between defendant's illegal arrest and subsequent confession, even though he was given *Miranda* warnings and waived his right to counsel).

By comparison, the Supreme Court has found intervening circumstances only when the events were sufficient to break the "causal chain[ ] between the [Fourth Amendment violation] and the statements made subsequent thereto." *Brown*, 422 U.S. at 602, 95 S.Ct. 2254. Examples of intervening circumstance sufficient to break that chain include a hearing before a magistrate judge at which the defendant was advised of his rights, *see Johnson v. Louisiana*, 406 U.S. 356, 365, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972); an arraignment plus a six-day release from custody, *see Wong Sun*, 371 U.S. at 491, 83 S.Ct. 407; and the issuance of a valid search warrant that resulted in the independent discovery of drugs and a spontaneous admission, *see Rawlings v. Kentucky*, 448 U.S. 98, 108–09, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980). *See also United States v. Wellins*, 654 F.2d 550, 555 (9th Cir.1981) (finding intervening circumstance when defendant was allowed to consult with his lawyer). When measured against these examples, Seidman's rather innocuous acts of closing a door and nodding to Schoop are not sufficient to break the causal chain.

Like the Supreme Court, our court has refused to find that the taint of a Fourth Amendment violation was purged when a suspect did not have the chance to consider his options rationally and make a free choice. In *United States v. Gooding*, 695 F.2d 78 (4th Cir.1982), the defendant (Gooding) was stopped illegally by police officers at a bus stop because they suspected he was carrying drugs. Within minutes of the illegal stop, the officers asked Gooding for permission to search his briefcase and flight bag. Gooding assented, opened his briefcase and bag, and actively handed items to the police officers to facilitate their search. There is no question that Gooding's actions manifested a willingness to cooperate with the search. Yet we held that Gooding's actions were not "intervening circumstances" sufficient to purge the taint of the Fourth Amendment violation. *See id.* at 84 (citing *Taylor*, *Dunaway*, and *Brown* ). If Gooding's positive signs of assent and cooperation were not sufficient, then Seidman's benign acts of shutting a door and nodding to Schoop could not be either.

In *McCraw*, another of our cases, a suspect consented to a search of his room and made statements that were voluntary manifestations of consent after the police had entered his room without his permission or a warrant. Nevertheless, we found the fruits of that search and the suspect's statements to be tainted by the Fourth Amendment violation:

> Assuming that the consent to search and hotel room statements were voluntary by fifth amendment standards, the proximity in time and place between the arrest and the search and statements and the absence of intervening circumstances nevertheless require suppression of this evidence to protect the physical integrity of the home and to vindicate the purpose of the fourth amendment.

*McCraw*, 920 F.2d at 230 (citations omitted).

The case law is clear. The majority is therefore wrong to conclude that Seidman's

consent to talk with Schoop should be double counted as consent under the Fifth Amendment and as an intervening circumstance under the Fourth. Seidman's actions are not the kind of intervening circumstances that either the Supreme Court or we have considered sufficient to attenuate the taint of a Fourth Amendment violation. Moreover, within a minute of pushing his way into Seidman's house, Schoop launched into a question aimed at getting Seidman to admit to illegal activity. Seidman simply did not have the opportunity "to consider carefully and objectively his options and to exercise his free will." *Taylor*, 457 U.S. at 691, 102 S.Ct. 2664. There was no intervening circumstance that attenuated or purged Schoop's violation of Seidman's Fourth Amendment rights. The "intervening circumstances" factor thus weighs heavily against the admission of the May 23 tape.[1]

### 2.

The last *Brown* factor looks at the "purpose and flagrancy" of the Fourth Amendment violation. Here, I disagree with the majority's suggestion that a government agent's conduct will be flagrant and purposeful only if it involves the degree of coercion present in *Brown* and *Wong Sun*. After setting the bar unjustifiably high, the majority compounds its mistake by again erroneously applying Fifth Amendment standards of voluntariness to conclude that the taint was attenuated. *See ante* at 550–551 ("Seidman acted voluntarily, without coercion or threat of force from Schoop").

It is true that the government's actions in *Brown* and *Wong Sun* were particularly flagrant. In *Brown,* for instance, a policeman held the defendant at gunpoint before getting his consent to search. "However, the flagrancy of police misconduct is not measured by how polite the police are to the defendant." *People v. Gonzalez,* 64 Cal.App.4th 432, 75 Cal.Rptr.2d 272, 280 (1998). The Supreme Court has made clear that the "purpose and flagrancy" inquiry looks for more

than evidence of intimidation that would render a confession involuntary under the Fifth Amendment. Rather, it is the "quality of purposefulness" of the *Fourth* Amendment violation that determines whether the taint of that violation is attenuated. *Brown,* 422 U.S. at 605, 95 S.Ct. 2254.

In *Taylor,* even though the police did not threaten or intimidate the defendant to get his confession after an illegal investigatory arrest, the Fourth Amendment violation was still found to be flagrant and purposeful misconduct. "The fact that the police did not physically abuse petitioner, or that the confession they obtained may have been 'voluntary' for purposes of the Fifth Amendment, does not cure the illegality of the initial arrest." *Taylor,* 457 U.S. at 693, 102 S.Ct. 2664. Similarly, the police misconduct in *Dunaway* (arresting the defendant without probable cause "in the hope something might turn up") did not involve threats or abuse against the defendant. Nevertheless, the Court identified *Dunaway* as "virtually a replica of the situation in *Brown*" and found that purposefulness of the Fourth Amendment violation required exclusion of the confession. *Dunaway,* 442 U.S. at 218, 99 S.Ct. 2248; *see also id.* at 220, 99 S.Ct. 2248 (Stevens, J., concurring):

> The flagrancy of the official misconduct is relevant, in my judgment, only insofar as it has a tendency to motivate the defendant. A midnight arrest with drawn guns will be equally frightening whether the police acted recklessly or in good faith. Conversely, a courteous command has the same effect on the arrestee whether the officer thinks he has probable cause or knows that he does not. In either event, if the Fourth Amendment is violated, the admissibility question will turn on the causal relationship between that violation and the defendant's subsequent confession.

In this case Schoop, who seemed desperate to engage Seidman in incriminating conversation, deliberately entered Seidman's home

---

1. The majority simply goes against precedent when it says, "We see no reason why [consent] could not also sever the connection between an unlawful act and the acquisition of additional evidence." *Ante* at 549–550 n. 10. Again, voluntary consent by itself does not cure a Fourth Amendment violation. The *Brown* factors must still be applied. *See Taylor,* 457 U.S. at 690–93, 102 S.Ct. 2664; *Dunaway,* 442 U.S. at 218, 99 S.Ct. 2248; *McCraw,* 920 F.2d at 230.

without permission. In addition, the federal agents directing Schoop had a cavalier attitude about Seidman's constitutional rights. This was confirmed during Schoop's second (agent-directed) attempt to gain entrance into Seidman's home on June 19, 1995, about three weeks after the first (wired) visit. Schoop's repeated knocks at the front door went unanswered, as did his call to Seidman from his (Schoop's) car phone. When Schoop returned to where the agents were parked, one agent asked, "Is his door locked this time?," and Schoop answered, "Yeah." This confirms that the agents condoned Schoop's violation of Seidman's Fourth Amendment rights on May 23 and that they were ready to encourage the very same violation on June 19. I can only conclude that Schoop's unconstitutional entry, and his handlers' complicity in it, was flagrant and purposeful. The third factor also weighs against the government.

### C.

All of the *Brown* factors cut against the government. No significant time elapsed between Schoop's illegal entry on May 23 and his conversation with Seidman. There were no intervening circumstances that broke the causal link between Schoop's entry and his efforts to draw Seidman into admissions of guilt. Finally, Schoop and his controllers flagrantly and purposefully disregarded Seidman's Fourth Amendment rights in order to position themselves to get a confession. As a

2. The majority's assertion notwithstanding, *see ante* at 549, I do not contend that lack of an intervening time period alone required suppression. Rather, my conclusion is based on a consideration of all three *Brown* factors.

3. The March 21 conversation included the following exchange:

Schoop: Well, look, Bub, why don't we meet for lunch, alright? Because, uh, they, they, they hit me with a lot of stuff and I, you know, there's only so much you can get away with and, you know, or that they buy.
Seidman: Well they're Department of Labor. Uh, what are they uh looking, ah, for the Department of Labor?
Schoop: Harry, the only thing I can do is just tell you what the hell they said, you know, to me. And what they said to me was that, they, they are very curious as to why a Controller of the Union would uh want to be, uh, you know, wou ... wou ... would okay the payments to me for typesetting that they claim I never did. And apparently ...

result, the government has not met its burden of establishing that the taint of Schoop's Fourth Amendment violation has been purged, even if Seidman's statements were voluntary under the Fifth Amendment. The tape of the May 23 conversation should have been suppressed.[2]

### II.

Although I do not agree with the majority's Fourth Amendment analysis, I do agree with the government that the error in admitting the May 23 tape was harmless. If the guilt of a defendant was established beyond a reasonable doubt without the evidence admitted in error, the error is harmless and we must affirm the conviction. *See United States v. Melgar*, 139 F.3d 1005, 1016 (4th Cir.1998).

Here, the evidence of guilt, even absent the taped conversation of May 23, was strong. *See ante* at 544–545, 546–547. Moreover, the government's main point about the May 23 tape, that Seidman was transparent in his failure to deny Schoop's suggestions of wrongdoing, is equally supported by an admissible tape that was also played to the jury. That was the tape of a telephone conversation on March 21 between Schoop and Seidman, in which Seidman also failed to deny Schoop's suggestions that they were in the middle of an illegal scheme.[3]

Seidman: But you did do it, you were ...
Schoop: Well, I'm saying I did too, bub, ha ha, but the only damn thing is that I'm, you know, very concerned.

    \*      \*      \*

Schoop: Alright, now how the hell do I answer the direct payment? You know what I'm saying? And I don't want to get into all this shit on the phone.
Seidman: The direct payments ... exactly what the letter says ... you gave the money, remember you all did me, you gave me the money because, exactly what you said, save the money for David because, again, you are known to gamble. [or][or] I mean, exactly what happened.
Schoop: No, it's not going to fly. It's not that easy, babes, it isn't.
Seidman: Well if it happens babe, you own your business ...
Schoop: Huh?
Seidman: I mean everything was out in the open. I mean it, Always everything was reported, all the figures were reported to,

**558**

The prosecutor devoted a considerable amount of time in his closing argument to the uncontested March 21 conversation, while he mentioned the inadmissible May 23 conversation only briefly to bolster his point. The May 23 conversation was merely cumulative of the admissible March 21 conversation. "Improper admission of evidence which is cumulative of matters shown by admissible evidence is harmless error." *Smith v. Firestone Tire & Rubber Co.*, 755 F.2d 129, 132 (8th Cir.1985). Because the May 23 tape was cumulative of admissible evidence, I would hold that the error in admitting the tape was harmless.

### III.

Because the May 23 tape was cumulative and because I concur in the majority opinion on the remaining issues, I vote to affirm Seidman's conviction.

KISER, Senior District Judge, concurring in part and dissenting in part:

I concur with Sections I, II and III of the majority opinion. I disagree with the majority, however, on the aiding and abetting issue presented in Section IV of its opinion.

In Section IV, the majority upholds the district court's jury instructions on counts two through thirteen of the indictment. First, the majority decides that Schoop, an independent contractor, was indirectly employed by the International Organization of Masters, Mates, and Pilots (the Union) for the purposes of 29 U.S.C.A. § 501(c). Thus, the majority concludes that Schoop could embezzle, steal, abstract, or convert funds from the Union under § 501(c). Then, the majority finds that Seidman could be guilty of aiding and abetting Schoop under 18 U.S.C.A. § 2(a).

I disagree with the majority on two points. First, whether or not Congress intended for § 501(c) to apply to independent contractors is unclear. Where a criminal statute is ambiguous, the rule of lenity prevents an expansive reading of the statute. Applying the rule of lenity, I conclude that Schoop was not employed by the Union under § 501(c). Therefore, Schoop was not legally capable of embezzling, stealing, abstracting, or converting funds under § 501(c). Second, the district court only instructed the jury that it could convict Seidman of aiding and abetting Schoop's embezzlement. Schoop lacked the necessary fiduciary relationship with the Union to be convicted of the underlying embezzlement, however. Thus, irrespective of whether or not § 501(c) extends to independent contractors, I find that Seidman could not have been convicted of aiding and abetting Schoop under § 2(a).

### I.

Section 501(c) of Title 29 provides that:

Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use, or the use of another, any of the moneys, funds, securities, property, or other assets of a labor organization of which he is an officer, or by which he is employed, directly or indirectly, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

Section 2(a) of Title 18 extends criminal liability to anyone who "aids, abets, counsels, commands, induces or procures" the commission of "an offense against the United States." The interaction of these two statutes means that Seidman could have been convicted of aiding and abetting under § 2(a), if Schoop could have been convicted as a principal under § 501(c). *United States*

---

uh, here I don't know if they actually report what the newspaper cost, they're a separate thing, there was the Finance Committee, this is what you charged.

Schoop: Yeah, okay, but what happens if they put a paper trace on this damn thing and they find out it never went into my account?

Seidman: Well, again, what you did, the reason you didn't put it in, as far as I know ... I mean I'm not sure if you put it in the account, but if you didn't, what you did was

you gave it to me because that's what you wanted to do. You told me to put it in a trust for David because you don't want to gamble it away and you were afraid that you were drinking and you wanted to save it for David.

Schoop: Harry, that story isn't gonna fly, babe. It isn't. It just isn't. Can you come up and meet me for lunch?

Seidman: At your place?

Schoop: Yeah.

*v. Coleman*, 940 F.Supp. 15, 17–18 (D.D.C. 1996); *United States v. Capanegro*, 576 F.2d 973, 980 (2d Cir.) (Friendly, J. dissenting), *cert. denied*, 439 U.S. 928, 99 S.Ct. 312, 58 L.Ed.2d 320 (1978). Schoop could have been convicted as a principal under § 501(c) if he embezzled, stole, or unlawfully and willfully abstracted or converted the funds at issue from a labor organization "by which he is employed."

### A.

First, I find that Schoop was not employed by the Union. "As a criminal statute, § 501(c) must be strictly construed." *United States v. Hart*, 417 F.Supp. 1314, 1321 (S.D.Iowa 1976) (citing *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95, 5 L.Ed. 37 (1820) ("The rule that penal laws are to be construed strictly, is perhaps not much less old than construction itself. It is founded on the tenderness of the law for the rights of individuals; and on the plain principle, that the power of punishment is vested in the legislative, not in the judicial department.")). *See also United States v. Belt*, 574 F.2d 1234, 1237–38 (5th Cir.1978) ("We have interpreted § 501(c) as a remedial statute creating a new federal crime to be given its broadest construction to reach the ills it was designed to counteract. Thus the duty imposed by the statute may be more stringent than that imposed by the common law if necessary to fulfill the statutory purpose. Nevertheless, because the statute is a criminal one, we must be wary of a too-broad construction that goes, beyond congressional intent or power.") (citations omitted).

The doctrine that a criminal statute should be construed strictly is known as the rule of lenity. "The rule of lenity is premised on two ideas: first, a fair warning should be given to the world in language that the common world will understand, of what the law

intends to do if a certain line is passed; second, legislatures and not courts should define criminal activity." *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 704 n. 18, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995) (citations and internal quotations omitted); *see also United States v. Lanier*, 520 U.S. 259, ——, 117 S.Ct. 1219, 1225, 137 L.Ed.2d 432 (1997) ("the canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered") (citations omitted); *Hughey v. United States*, 495 U.S. 411, 422, 110 S.Ct. 1979, 109 L.Ed.2d 408 (1990) (lenity principles "demand resolution of ambiguities in criminal statutes in favor of the defendant") (citation omitted); *Crandon v. United States*, 494 U.S. 152, 160, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990) ("Because construction of a criminal statute must be guided by the need for fair warning, it is rare that legislative history or statutory policies will support a construction of a statute broader than that clearly warranted by the text."). Under the rule of lenity, a court "will not interpret a federal criminal statute so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what Congress intended." *Ladner v. United States*, 358 U.S. 169, 178, 79 S.Ct. 209, 3 L.Ed.2d 199 (1958).

It is unclear what Congress intended when it used the phrase "by which he is employed." The use of such language could have been a deliberate attempt to avoid the use of the term "employee," as the majorities in this case and *Capanegro* have concluded. *See Capanegro*, 576 F.2d at 978–79.[1] Alternatively, the use of the phrase merely could have been a "draftsman's choice." *Id.* at 981 (Friendly, J., dissenting). I am inclined to agree with Judge Friendly that this was a

---

1. In *Capanegro*, the majority stated "the statute, in our view, clearly provides that [an independent contractor] is unambiguously within its coverage." 576 F.2d at 980. I do not understand how the *Capanegro* majority could claim that § 501(c) "unambiguously" supported its conclusion, when a jurist as learned as Judge Friendly dissented on that very issue. Indeed, if it were entirely unambiguous, the Supreme Court would not have stated that § "501(c) ... establishes

criminal penalties for embezzlement or theft by a union officer or *employee*." *Guidry v. Sheet Metal Workers National Pension Fund*, 493 U.S. 365, 374 n. 15, 110 S.Ct. 680, 107 L.Ed.2d 782 (1990) (emphasis added). The Supreme Court was addressing a different issue and even to call this statement dictum would be a stretch, but the statement of the unanimous Court undermines a claim that the statute is unambiguous.

choice of form and not substance.[2] I do not need to reach this ultimate conclusion, however. I am satisfied that, at a minimum, the statute is ambiguous and any construction of the statute should be governed by the rule of lenity.

Absent a clear indication by Congress that it intended § 501(c) to reach non-employees, I am bound by the rule of lenity to restrict the reach of the statute to employees. First, I find that the majority's interpretation of § 501(c) does not provide fair warning to independent contractors that they are subject to federal criminal liability under § 501(c). Second, and most importantly, whether or not to extend criminal liability for a violation of § 501(c) to independent contractors is the exclusive province of the legislative branch, not the judiciary. Since Congress has not chosen to explicitly extend liability to independent contractors, it is not our place to do so now.

Accordingly, I find that the rule of lenity precludes the majority's interpretation of § 501.[3] Applying the rule of lenity, I conclude that Schoop could not have been employed by the Union under § 501(c). Since Schoop could not be have been employed by the Union, he was not subject to criminal liability under § 501(c). Consequently, Seidman could not be guilty of aiding and abetting Schoop. Therefore, the district court erroneously instructed the jury that it could convict Seidman of aiding and abetting under § 2(a).

## B.

Assuming that Schoop was employed by the Union, I conclude that the district court's instructions only permitted the jury to convict Seidman of aiding and abetting Schoop's *embezzlement,* an underlying crime which Schoop could not have committed.

Where the government requests and district court applies the correct legal standard, the interaction of 29 U.S.C.A. § 501(c) and 18 U.S.C.A. §§ 2(a) and (b) provide adequate protection for union property from union officials and employees.

---

2. I tend to agree with Judge Friendly for four reasons. First, as Judge Friendly pointed out, Congress entertained versions of the Labor–Management Reporting and Disclosure Act that more clearly would have extended criminal liability beyond employees. Yet, it did not enact such a statute. *Capanegro,* 576 F.2d at 981 n. 1 (Friendly, J., dissenting).

Second, as the majority pointed out, the definition of "employee" in 29 U.S.C.A. § 152(3) explicitly excludes independent contractors.

Third, Congress has demonstrated that where it wants to extend criminal liability beyond employees in the labor-management context, it knows how to do so. *See* 18 U.S.C.A. § 664 (liability extended to "[a]ny person" rather than "[a]ny person ... by which he is employed").

Fourth, Congress did not need to extend criminal liability under § 501(c) to independent contractors in order to accomplish its objectives. As the Second Circuit stated in *United States v. Robinson,* "[t]here is no question but that the legislative history of the statute reveals that the Congress was principally concerned with the looting of union treasuries *by union leaders* for their personal profit." 512 F.2d 491, 493–94 (2d Cir.) (citing Congressional debate) (emphasis added), *cert. denied sub nom. Villegas v. United States,* 423 U.S. 853, 96 S.Ct. 100, 46 L.Ed.2d 78 (1975); *see also United States v. Silverman,* 430 F.2d 106, 113 (2d Cir.) ("It was the plain intention of Congress to hold officers and employees strictly responsible as fiduciaries for the union funds entrusted to them ....") (citation omitted) (Moore, J., dissenting), *modified on other grounds,* 439 F.2d 1198 (1970), *and cert. denied,* 402 U.S. 953, 91 S.Ct. 1619, 29 L.Ed.2d 123 (1971).

3. As stated earlier, the majority concludes that Schoop was indirectly employed by the Union. Thus, the majority assumes that "directly or indirectly," as used in § 501(c), modifies "by which he is employed." The precedent I found on this issue, however, implies that "directly or indirectly" actually modifies "embezzles, steals, or unlawfully and willfully abstracts or converts." *See Robinson,* 512 F.2d at 494 ("It is understandable that this kind of obvious abuse by union officials was the principal concern of congressional leaders in the hearings and debates which preceded the enactment of the statute in question. However, it is evident from the clear and unambiguous language employed by the statute that the behavior condemned is not limited to the embezzlement or conversion of union funds. The statutory language condemns the embezzlement or conversion not only of moneys, funds and securities, but also of 'property, or other assets of a labor organization ... directly or indirectly....'"); *Silverman,* 430 F.2d at 113 (purpose of § 501(c) "should not be subverted by the use of indirect methods") (Moore, J. dissenting) (citation omitted); *Capanegro,* 576 F.2d at 977 n. 3 (discussing *Robinson* ). I do not opine as to which phrase "directly or indirectly" modifies. I simply note these cases as evidence that this less than artfully drafted statute is ambiguous.

The lower court instructed the jury that "[c]ounts two through thirteen of the indictment, these are not the conspiracy counts but the substantive counts, also charge Mr. Seidman with aiding and abetting the embezzlement of funds of the [Union]." J.A. at 1015. The lower court then went on to instruct the jury that "under the facts of this case this aiding and abetting concept concerns the theory that it was Mr. Schoop who committed the embezzlements in Counts 2 through 13 inclusive, but that Mr. Seidman aided and abetted Mr. Schoop in doing it.... As you can see, the first requirement is that you find that another person, Mr. Schoop, has committed the crime charged, the embezzlement alleged in the substantive count. Obviously, no one can be convicted of aiding and abetting the criminal acts of another if no crime was committed by the other person in the first place so, therefore, if Mr. Schoop did not commit the embezzlements charged in 2 through 13 then Mr. Seidman could not be convicted of aiding and abetting Mr. Schoop." J.A. at 1016.

The Fourth Circuit discussed embezzlement under § 501(c) in *United States v. Stockton,* 788 F.2d 210 (4th Cir.), *cert. denied,* 479 U.S. 840, 107 S.Ct. 147, 93 L.Ed.2d 89 (1986):

> Although § 501(c) reaches other theft offenses as well, it is clear that embezzlement is the statute's primary concern. The section is captioned "embezzlement of assets," and its legislative history refers to it as a provision designed to impose a federal punishment for embezzlement....
>
> Looking first to the language of § 501(c), we note that Congress chose to use the term "embezzle," a term which already acquired a generally accepted legal meaning in court decisions interpreting state statutes.[4] ...
>
> Nothing in the legislative history of § 501(c) contradicts the conclusion that Congress meant to adopt the traditional concept of embezzlement....

The central element of the traditional concept of embezzlement is the conversion of property belonging to another. Conversion involves an act of control or dominion over the property that seriously interferes with the owner's rights....

> The crime of embezzlement builds on the concept of conversion, but adds two further elements. First, the embezzled property must have been in the lawful possession of the defendant at the time of its appropriation. Second, embezzlement requires knowledge that the appropriation is contrary to the wishes of the owner of the property. In less formal language, the defendant must have taken another person's property or caused it to be taken, knowing that the other person would not have wanted that to be done....
>
> To sum up, then, the traditional concept of embezzlement comprises (1) a conversion—or, in other words, an unauthorized appropriation—of property belonging to another, where (2) the property is lawfully in the defendant's possession (though for a limited purpose) at the time of the appropriation, and (3) the defendant acts with knowledge that his appropriation of the property is unauthorized, or at least without a good-faith belief that it has been authorized.

*Id.* at 215–17 (internal quotation, citations and footnotes omitted).

To be subject to conviction for embezzlement under § 501(c), Schoop must have come into possession of the property at issue by way of a fiduciary relationship with the Union. *Id.* at 215 n. 4; *see also Colella v. United States,* 360 F.2d 792, 799 (1st Cir.) ("Embezzlement ... carries with it the concept of a breach of a fiduciary relationship."), *cert. denied,* 385 U.S. 829, 87 S.Ct. 65, 17 L.Ed.2d 65 (1966). In this case, there clearly was no such position of trust between Schoop and the Union.[5]

Despite the embezzlement instructions and the lack of a fiduciary relationship between Schoop and the Union, the majority

---

**4.** Embezzlement is a statutory crime which did not exist at common law.... A defendant who obtained possession of property lawfully, in a fiduciary capacity, before converting it could not be convicted at common law. Embezzlement

statutes were enacted to remedy the common law's deficiency.

**5.** The majority agrees with this point in footnote 15 of its opinion.

would uphold Seidman's aiding and abetting convictions. The majority concludes that the district court's instructions would have permitted a jury to find that Schoop stole or converted funds from the Union and that Seidman aided and abetted in that crime.

Assuming that Schoop was employed by the Union under § 501(c), I agree with the majority that the *facts* would support a conclusion that Schoop stole or converted funds from the Union. However, the lower court did not so instruct the jury. In its aiding and abetting instruction, the district court never mentioned stealing, abstracting or converting, yet it referenced embezzlement on several occasions. J.A. at 1015–16 (quoted above); J.A. at 1018 ("Now if you look back or think back to Count One, conspiracy, and the other counts, embezzlement, you will see in each of them there are three concepts that are very important ... knowingly, willfully, intentionally."); J.A. at 1020 ("It is important to bear in mind that this is a criminal embezzlement case...."); J.A. at 1021 (discussing how negligence cannot be basis for conviction of embezzlement). The majority concludes that the lower court used "embezzlement" as an abbreviation for describing all of the conduct prohibited by § 501(c).[6] Indeed, following the defendant's objections, the lower court intimated that the instruction covered embezzlement and conversion. J.A. at 1033. No matter what the lower court's subjective intent, it still only instructed the jury that it could convict Seidman of aiding and abetting Schoop's embezzlement. It never instructed the jury that they could convict Seidman of aiding and abetting Schoop's conversion.[7]

Without more clear instruction from the bench, I conclude that the jury only could have convicted Seidman of aiding and abetting Schoop's embezzlement from the Union. Because, as has been admitted, the requisite fiduciary relationship did not exist, Schoop could not have been convicted of the underlying embezzlement. Where a conviction on the underlying crime is not possible, there also can be no conviction for aiding and abetting that alleged underlying crime. *See United States v. Blackwood,* 735 F.2d 142 (4th Cir.1984) (defendant's conviction for aiding and abetting overturned where court gave incorrect legal standard for determining guilt of principal).

In summation, I find that Schoop could not have been convicted of embezzling from the Union. I also find that the lower court did not instruct the jury that it could convict Seidman of aiding and abetting on a theory that Schoop stole or converted funds from the Union. Therefore, irrespective of whether or not Schoop was employed by the union, I conclude that the district court erroneously instructed the jury that it could convict Seidman of aiding and abetting under § 2(a).

C.

As pointed out by the majority, where the district court instructs the jury as to two alternative theories of guilt, and one is an incorrect statement of the law, it must be clear that the jury convicted upon the correct legal theory or the guilty verdict must be overturned. *See Yates v. United States,* 354

---

**6.** In support of its conclusion, the majority notes that the lower court discussed embezzling, stealing and converting when it instructed the jury on Seidman's principal liability under § 501(c). *See* J.A. at 1008. The lower court instructed the jury that it could convict Seidman as a principal if it found that he had "embezzled, stole, abstracted or converted" finds from the Union. J.A. at 1009–10. The lower court then instructed the jury that "[e]mbezzlement is the voluntary and intentional taking or conversion to one's use of the money or property of another after that money ey to property lawfully came into the possession of the person taking it by virtue of some office, employment, or position of trust." J.A. at 1011. The court also instructed as to the definitions of abstraction and conversion. J.A. at 1011. The court then provided a hypothetical to differentiate between the concepts of embezzlement and

robbery. J.A. at 1012. After providing the jury with definitions as to all of the possibilities for convicting Seidman as a principal, the district court then limited its instructions regarding the underlying offense for aiding and abetting to embezzlement. Such limitation by the lower court may have been unintentional. Nonetheless, it effectively informed the jury that it could only convict Seidman of aiding and abetting if it first concluded that Schoop embezzled from the Union.

**7.** "Congress recognized that there was a difference between embezzlement and conversion by including both in the statute." *United States v. Harmon,* 339 F.2d 354, 357 (6th Cir.1964), *cert. denied,* 380 U.S. 944, 85 S.Ct. 1025, 13 L.Ed.2d 963 (1965).

U.S. 298, 312, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957) ("[W]e think the proper rule to be applied is that which requires a verdict to be set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected."), *overruled on other grounds by Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *Griffin v. United States,* 502 U.S. 46, 49–60, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991) (discussing and applying *Yates*). Here, the lower court instructed the jury that Seidman could be convicted on either one of two different theories: (1) embezzlement, abstraction or conversion under 29 U.S.C.A. § 501(c) or (2) aiding and abetting Schoop's embezzlement under 18 U.S.C.A. § 2(a). As discussed above, the latter theory of guilt was an incorrect statement of the law. Therefore, unless it can be ascertained that the jury convicted Seidman under the former theory, the convictions as to counts two through thirteen must be reversed.

In this case, the district court provided the jury with a general verdict form which did not clarify whether the convictions on counts two through thirteen were based upon a finding of principal liability under § 501(c) or aiding and abetting liability under § 2(a).[8] Thus, it is unclear whether the jury's verdict was based upon the valid or invalid alternative. Accordingly, under *Yates,* the guilty verdicts as to counts two through thirteen must be overturned.

### II.

While I believe that the jury likely would have convicted Seidman as a principal under

---

**8.** At footnote 14 of its opinion, the majority states its belief that Seidman could have been convicted as a principal under 18 U.S.C.A. § 2(b). I believe the facts of this case would have supported such a conviction. The court's instructions do not support such a conviction, however. The court below instructed only as to aiding and abetting under § 2(a). It did not instruct the jury regarding punishment as a principal under § 2(b). J.A. 1015–1018. As with the lower court's failure to instruct on conversion in its aiding and abetting charge, I cannot agree that a person can be convicted on a theory which was never presented to the jury.

**9.** Appellant argues that the error with respect to counts two through thirteen tainted the entire

§ 501(c), I cannot turn a blind eye to the error in this case. As a reviewing court, it is our task to strictly interpret criminal statutes and to check abuse of the criminal process. In this case, the government requested and the court gave an instruction which erroneously allowed the jury to convict Seidman of aiding and abetting Schoop's § 501(c) embezzlement. A conviction possibly based upon a legally erroneous instruction cannot stand. Accordingly, I would reverse the convictions as to counts two through thirteen.[9]

---

proceeding and requires reversal of the conspiracy conviction as well. I disagree. The lower court clearly instructed the jury that the conspiracy charge in count one was separate and distinct from the charges in counts two through thirteen. *See* J.A. at 995. I conclude, therefore, that the conspiracy instruction and aiding and abetting instruction "were not so intertwined that it was highly probable that [Seidman] was prejudiced on the [conspiracy] count[ ] by the erroneous instruction on the [aiding and abetting] counts." *United States v. Walker,* 677 F.2d 1014, 1016 n. 2 (4th Cir.1982) (citation omitted). Here, the evidence of the conspiracy and the evidence of each of the various object offenses which could have formed the basis of the conspiracy conviction was simply overwhelming.