STATE OF NORTH CAROLINA v. DERRICK WHEELER

No. COA09-768

(Filed 19 January 2010)

**1. Constitutional Law— right to counsel—discharge of appointed counsel—refused**

The trial court did not abuse its discretion by denying defendant's motion to discharge his appointed counsel and represent himself where he had previously told the judge that he wanted his appointed attorney to take over and select the jury. Defendant had already discharged four or five appointed lawyers and the trial court made clear that defendant would not be permitted to discharge defense counsel again if defendant wanted the lawyer to conduct the jury selection.

**2. Appeal and Error— plain error—not argued in brief—waived**

Defendant waived appellate review of whether there was plain error in the trial court's failure to instruct the jury on a lesser included offense where defendant did not argue plain error in his brief.

**3. Sentencing— three misdemeanors—sentence excessive**

The trial court erred by sentencing defendant to 165 days in prison for three misdemeanors where the most serious conviction carried a maximum punishment of 75 days. Pursuant to N.C.G.S. § 15A-1340.22, the cumulative consecutive sentences for two or more misdemeanors shall not exceed twice the maximum sentence of the most serious offense.

**4. Probation and Parole— probation—24 months—findings not sufficient**

A sentence for three misdemeanors was remanded where the court placed defendant on probation for 24 months without making a finding that a term longer than 18 months was necessary. N.C.G.S. § 15A-1343.2(d).

Appeal by Defendant from judgments and commitment entered 17 October 2008 by Judge Thomas D. Haigwood in Superior Court, Pitt County. Heard in the Court of Appeals 2 December 2009.

. *Attorney General Roy Cooper, by Assistant Attorney General John A. Payne, for the State.*

*Russell J. Hollers III for Defendant-Appellant.*

STEPHENS, Judge.

*I. Factual Background and Procedural History*

On 28 January 2008, a Pitt County Grand Jury returned bills of indictment against Defendant for the crimes of fleeing/eluding arrest with a motor vehicle, reckless driving, speeding, giving a false fire alarm, assault on a public officer, failure to heed a siren, driving left of center, improper passing, first degree kidnapping, assault on a female, and assault inflicting serious bodily injury. The record on appeal contains a handwritten document dated 16 September 2008, in which Defendant expressed his desire to represent himself. On 13 October 2008, Defendant signed a written waiver of counsel.[1]

This matter came on for trial during the 13 October 2008 Pitt County Superior Court criminal session, the Honorable Thomas D. Haigwood presiding. The trial court inquired of Defendant regarding his understanding of the nature of the charges against him, his right to the assistance of counsel, and the consequences of his decision to proceed without counsel. Defendant confirmed that he understood the charges against him and stated that he would like to proceed without·counsel. Defendant signed a waiver of counsel form. The trial judge allowed Defendant's waiver of counsel and appointed Jeff Foster ("Mr. Foster") as stand-by counsel.

Prior to the full proceedings, Mr. Foster informed the trial judge that Defendant would like for him to select the jury. In response, the trial judge informed Defendant that

> you're going to have it one way or the other way. You're either going to have Mr. Foster represent you and be your lawyer or you're going to be—you're going to represent yourself and he's there to assist you, or you can ask him questions.
>
> But you can't have it both ways. So you need to tell me—I explained to you earlier in great detail that I will hold you to the same knowledge of the law and how you conduct yourself in this case just as I would any other member of this bar.

---

1. Neither the 16 September nor the 13 October 2008 documents contained in the record on appeal are file stamped.

The trial judge asked Defendant, "Now, tell me, do you want Mr. Foster to represent you or do you want to represent yourself?" Defendant responded, "I'll let [Mr. Foster] go ahead and take over. . . . I think that probably would be better right now because I'm really unprepared." The trial judge further explained to Defendant, "Now, you need to understand if I put him back in here representing you in this matter, I'm not going to permit you to discharge him. He's in it to the end." Defendant responded that he understood.

The day after jury selection, Defendant again tried to discharge Mr. Foster and represent himself. Defendant admitted that he had already discharged four or five attorneys prior to trial. As a result of his previous waiver of his right to represent himself, the trial judge denied Defendant's motion to discharge defense counsel.

At trial, the evidence presented by the State tended to show the following: On 11 January 2008, Delores Purvis ("Purvis") was working at Alliance One in Farmville, North Carolina, when she took a "lunch break" a little after 8:00 p.m. On her break, Purvis went to her vehicle which was parked in the employee parking lot to relax and listen to music. While sitting in her vehicle, Purvis saw Defendant's van driving into the parking lot. Defendant parked his van beside Purvis' vehicle, and exited his van and approached Purvis' vehicle. Defendant opened the driver's side door of Purvis' vehicle and asked Purvis for money. Purvis explained that she only had ten or fifteen dollars, and Defendant said that he needed more than that for gas. Purvis eventually closed her door, told Defendant she was leaving, and drove away.

Defendant followed Purvis in his van. Defendant pulled up behind Purvis and then suddenly swerved in front of Purvis' vehicle, forcing Purvis to stop suddenly in the middle of the two-lane street to avoid hitting Defendant. Defendant exited his van and walked over to the driver's side of Purvis' vehicle. Defendant again requested money from Purvis, and Purvis repeated her earlier answer that she only had ten to fifteen dollars. Defendant said that he needed more money, and he grabbed Purvis' arm and twisted it until it broke. Defendant reached into the car and attempted to grab Purvis' "fanny pack" which was sitting in the front passenger's seat. Defendant punched Purvis in the shoulder with a closed fist and kicked her left knee. Defendant finally grabbed the fanny pack from Purvis, returned to his van, and drove away toward Greenville, North Carolina.

Purvis was scared and unable to drive without the use of her broken arm, and she remained in her vehicle which was still parked

in the middle of the street. A woman driving a sports utility vehicle ("SUV") pulled up behind Purvis, and told her to turn her lights on because she had almost hit Purvis' vehicle. Purvis yelled for the woman to call the police, and the SUV drove away. Approximately ten to fifteen minutes after leaving, Defendant came back and parked his van on the opposite side of the road. Defendant "jumped out [of] the [van]" and asked for more money. Defendant hit Purvis in the shoulder again and kicked her, and Defendant tried to force Purvis out of the car by pulling on her injured arm. Defendant picked Purvis up, carried her toward his van, and placed Purvis in the front passenger seat. The woman in the SUV came back and parked a short distance behind Defendant's van. Purvis kicked open the passenger door of Defendant's van and ran to the woman's SUV and climbed into the back seat. Defendant approached the SUV, but returned to his van and drove away when he saw police lights approaching. Purvis was taken to the hospital, and her arm was placed in a cast for six to seven weeks.

Officer Brett Foust ("Foust"), a detective with the narcotics unit with the Pitt County Sheriff's Office, testified that he arrived on the scene in a marked sheriff's vehicle with his blue lights activated where Purvis' and Defendant's vehicles were stopped. Foust exited his vehicle, drew his gun, and yelled for Defendant to "[s]top" and "[g]et on the ground." Defendant ignored Foust's orders and left the scene in his van. Foust returned to his vehicle, followed Defendant, and advised on the radio that he was involved in a car chase. Foust followed Defendant's vehicle with his blue lights and siren turned on for approximately a mile and a half until Defendant made a sharp u-turn into a field on the left-hand side of the road and then continued driving on the opposite side of the road toward Greenville. Foust observed Defendant "carelessly and recklessly pass multiple vehicles in the double yellow line, passing them on the left[,]" and "almost strike other vehicles who were coming" in the other lane. Foust testified that the speed of the chase "[got] up in about the 90s[, but] most of the time seemed like [it was] staying in the mid-80s." The posted speed limit was 55 miles per hour for the stretch on which the chase occurred.

Deputy William A. Gibbs ("Gibbs") of the Pitt County Sheriff's Office joined the chase and initially traveled behind Defendant and Officer Foust with his blue lights and siren turned on. During the chase, "stop sticks" were thrown in the road in order to stop Defendant's vehicle. Defendant and Officer Foust drove their vehicles

over the stop sticks which deflated their tires. Gibbs became the lead police vehicle once Foust's tires were deflated and followed Defendant for approximately one mile. Defendant stopped his vehicle and Gibbs pulled in behind him. Defendant exited his vehicle, and Gibbs instructed him to get down on the ground. Gibbs repeated this instruction four or five times, but Defendant did not comply. Finally, a Farmville police officer helped get Defendant on the ground, at which point Gibbs was able to restrain Defendant with handcuffs. Gibbs testified that Defendant appeared to be intoxicated.

The evidence presented by Defendant tended to show the following: Defendant testified that he went to see Purvis at the Alliance One employee parking lot in order to tell her that he was leaving town for two to three weeks and that this made Purvis jealous because she thought he was going to see another woman. Defendant testified that he asked Purvis to follow him to a gas station so that she could use her credit card to pay for his gas. Defendant pulled into a gas station and expected Purvis to pull in behind him, but her car continued driving past the gas station. At that point, Defendant realized that his cell phone was in Purvis' vehicle, so Defendant got back inside his van to catch up to Purvis, and he pulled up beside her. Defendant asked Purvis if she had his phone and Purvis started to pull off. Defendant pulled in front of Purvis' vehicle, stopped, and exited his van. Defendant walked up to Purvis' door and asked for his cell phone. Purvis refused to give Defendant his cell phone. Defendant reached inside the vehicle to feel for his phone but it was not there. Defendant tried to take Purvis' keys to prevent her from leaving, and he felt Purvis scratching him. Defendant's reaction to being scratched caused Purvis to hit her hand on the door frame. At that point, a woman driving an SUV pulled up beside Purvis' vehicle and told them to turn on their lights because she had almost hit Purvis' vehicle. Purvis yelled for the woman to call 911. Defendant still could not find his cell phone, but he reached inside the vehicle and grabbed Purvis' fanny pack. Defendant got into his van and drove away.

Defendant looked inside the fanny pack and realized that he still did not have his cell phone, so he drove back to where Purvis' vehicle was stopped in the road. Defendant did not see Purvis' vehicle so he pulled over on the side of the road in the grass. Defendant was looking around for his cell phone when he felt a pain in his cheekbone, and he realized he was being hit in the face with keys. Defendant held Purvis to prevent her from hitting him again, and then the two agreed to leave together in Defendant's van. Defendant

helped Purvis into the van. The lady in the SUV returned and yelled for Purvis to run to her car. Purvis jumped out of the van and ran to the SUV. The driver of the SUV yelled that she was armed, and Defendant left the scene. Defendant testified that he did not see any police following him and that "[t]here wasn't no chase."

On 17 October 2008, the jury found Defendant guilty of felonious operation of a motor vehicle to elude arrest, guilty of giving a false fire alarm, guilty of false imprisonment, and guilty of assault inflicting serious injury. The trial court entered consecutive judgments on the verdicts, committed Defendant to the custody of the North Carolina Department of Correction for eight to ten months for eluding arrest, and ordered Defendant to pay $5,782.50 in restitution and attorney's fees. The trial court imposed a term of 75 days imprisonment for assault inflicting serious injury, 45 days for false imprisonment, and 45 days for giving a false fire alarm. The trial court suspended these sentences and followed Defendant's jail term with 24 months of supervised probation. Defendant gave notice of appeal from the judgments and commitment in open court.

## II. Discussion

### A. Waiver of Right to Represent Oneself

**[1]** Defendant argues that the trial court committed reversible error in denying his motion to have defense counsel removed and permit him to represent himself. The State contends that Defendant waived his right to self-representation when he told the trial judge that he wanted Mr. Foster to take over and select the jury. We are persuaded by the State's contention.

Our case law on the waiver of one's right to self-representation is limited. Our Court addressed this issue in *State v. Walters*, 182 N.C. App. 285, 641 S.E.2d 758 (2007), in which the State argued that the defendant had waived his right to self-representation by electing to proceed with his attorney after requesting to represent himself. *Id.* at 291, 641 S.E.2d at 761. This Court rejected the State's argument in *Walters* after finding that the defendant had timely asserted his right to self-representation when his case was called prior to jury selection and stated his dissatisfaction with his appointed counsel. *Id.* at 293, 641 S.E.2d at 762.

Our analysis in *Walters* relied heavily on the decision of the United States Court of Appeals for the Fourth Circuit in *United States v. Singleton*, 107 F.3d 1091 (4th Cir.), *cert. denied*, 522 U.S. 825, 139

L. Ed. 2d 41 (1997). We find the analysis in *Singleton* helpful in our consideration of the case *sub judice*, although we note that decisions from the Fourth Circuit are non-binding on this Court. In *Singleton*, defendant Singleton was represented by appointed counsel until the second day of Singleton's three-day trial. *Id.* at 1094. Defense counsel cross-examined 15 of the government's witnesses on the first day of trial. *Id.* On the second day, as defense counsel prepared to cross-examine the second witness of that day, Singleton notified the trial court that he was not satisfied with his attorney and wanted to participate personally in the cross-examination and in the closing argument. *Id.* The trial court denied Singleton's requests. *Id.* As defense counsel proceeded, Singleton interjected in an attempt to participate in his representation. *Id.* The trial court ruled that Singleton could not participate in the trial, and informed Singleton that "[i]f you decide you want to discharge [defense counsel], I will deal with that when it occurs." *Id.*

Singleton expressed his desire to discharge defense counsel. *Id.* The trial court allowed Singleton to discharge his attorney, but cautioned Singleton that he would not be permitted to both represent himself *and* have an attorney in an advisory role, instructing Singleton that, "You will either take it alone or you are not going to take it alone. I will not allow some hybrid." *Id.* Singleton decided to represent himself for the remainder of his trial, and was convicted of 16 of the 20 counts on which he was indicted. *Id.* at 1095.

On appeal, Singleton argued that the trial court failed to ensure that his waiver of counsel and decision to represent himself was made " 'knowingly and intelligently,' " or in the alternative, that the trial court "undermined his right of self-representation by refusing his request for a recess before beginning his representation of himself and by denying him [his appointed counsel's] assistance in an advisory role." *Id.* In its analysis, the Fourth Circuit noted that "[a]s with the right to counsel, a defendant may waive his right to self-representation." *Id.* at 1096. "In order to preserve both the right to counsel and the right to self-representation, a trial court must proceed with care in evaluating a defendant's expressed desire to forgo the representation of counsel and conduct his own defense." *Id.*

["]A trial court evaluating a defendant's request to represent himself must traverse . . . a thin line between improperly allowing the defendant to proceed *pro se*, thereby violating his right to counsel, and improperly having the defendant proceed with

counsel, thereby violating his right to self-representation. A skillful defendant could manipulate this dilemma to create reversible error.["]

*Id.* (quoting *Fields v. Murray*, 49 F.3d 1024, 1029 (4th Cir. 1995) (en banc) (internal quotation marks and citations omitted)). "Of the two rights, however, the right to counsel is preeminent and hence, the default position." *Id.*

Because of the legal preeminence of the right to representation by counsel and the need to maintain judicial order, we have held that while the right to counsel may be waived only expressly, knowingly, and intelligently, "the right to self-representation can be waived by failure timely to assert it, or by subsequent conduct giving the appearance of uncertainty." [*United States v. Gillis*, 773 F.2d 549, 559 (4th Cir. 1985) (citations omitted)]. Consequently, if a defendant proceeds to trial with counsel and asserts his right to self-representation only after trial has begun, that right may have been waived, and its exercise may be denied, limited, or conditioned. Accordingly, after trial has begun with counsel, the decision whether to allow the defendant to proceed *pro se* rests in the sound discretion of the trial court.

*Id.*

In *Singleton*, the Fourth Circuit held that the trial court did not abuse its discretion in limiting Singleton's representation to either self-representation or by appointed counsel and refusing to permit any "hybrid" representation. *Id.* The Fourth Circuit noted that Singleton did not express his desire to waive counsel until the second day of his three-day trial and the jury and witnesses were waiting expectantly. *Id.* at 1099. Thus, the trial court was under no obligation to allow Singleton to begin representing himself mid-trial. *Id.*

We find the Fourth Circuit's analysis in *Singleton* informative and instructive in our consideration of the present case. Here, before trial, Defendant made a knowing and intelligent waiver of his right to the assistance of counsel and informed the trial court that he wanted to proceed *pro se*. Thereafter, Defendant informed the trial court of his desire for appointed counsel to select the jury. The trial court allowed Defendant's request but expressly informed Defendant that he would be held to his decision and he would not be permitted to discharge defense counsel again. Defendant accepted the trial court's conditions and stated that he wished to proceed with counsel. After the

jury had been selected and impaneled and trial had begun, Defendant once again attempted to discharge defense counsel. The trial court denied Defendant's request, noting that Defendant had already discharged four or five lawyers and that Defendant had been uncooperative with appointed counsel.

In light of the timing of Defendant's request and Defendant's repeated attempts to frustrate the efforts of appointed counsel, and in considering the Fourth Circuit's decision in *Singleton*, we hold that the trial court did not abuse its discretion in denying Defendant's motion to discharge counsel and represent himself. *See United States v. Lawrence*, 605 F.2d 1321, 1322-25 (4th Cir. 1979) (where represented defendant first asserts right to self-representation only after jury had been selected though not sworn, decision to allow *pro se* representation rests in sound discretion of trial court); *United States v. Dunlap*, 577 F.2d 867, 868 (4th Cir. 1978) (holding that a defendant does not have an absolute right to dismiss counsel and conduct his own defense after trial has begun because of need "to minimize disruptions, to avoid inconvenience and delay, to maintain continuity, and to avoid confusing the jury"). The trial court made it clear to Defendant that he would not be permitted to discharge defense counsel again if he decided he wanted Mr. Foster to conduct the jury selection. Defendant informed the trial court that he understood and wanted Mr. Foster to take over. Defendant's argument that he was denied his right to self-representation is overruled.

### B. Jury Instructions

[2] Defendant next argues that the trial court erred by failing to instruct the jury on the lesser included offense of misdemeanor fleeing to elude arrest.

The trial court instructed the jury on felonious operation of a motor vehicle to elude arrest, but did not instruct on the lesser included offense of misdemeanor fleeing to elude arrest. Defendant failed to object to this instruction at trial, and is thus limited to plain error review. *See* N.C. R. App. P. 10(c)(4). In criminal trials, plain error review is available for challenges to jury instructions and evidentiary issues. *Dogwood Dev. and Mgmt. Co., LLC v. White Oak Transp. Co., Inc.*, 362 N.C. 191, 196, 657 S.E.2d 361, 364 (2008).

Although in his assignment of error he "specifically and distinctly contended" pursuant to Rule 10(c)(4) of the Rules of Appellate Procedure that the error amounted to plain error, defendant

failed to argue in his brief that the trial court's instruction amounted to plain error. *See* N.C. R. App. P. 28(a), (b)(5). Accordingly, defendant has waived appellate review of this assignment of error.

*State v. Nobles*, 350 N.C. 483, 514-15, 515 S.E.2d 885, 904 (1999). Defendant's argument is dismissed.

### C. Sentencing for Three Consecutive Terms for Misdemeanors

[3] Defendant also argues that the trial court erroneously sentenced him to three consecutive terms for misdemeanor offenses. The State concedes that this portion of Defendant's sentence was entered in error.

Pursuant to N.C. Gen. Stat. § 15A-1340.22 (2007), if a trial court imposes consecutive sentences for two or more misdemeanors, "the cumulative length of the sentences of imprisonment shall not exceed twice the maximum sentence authorized for the class and prior conviction level of the most serious offense." Here, the trial court entered three consecutive misdemeanor judgments against Defendant for assault, false imprisonment, and false fire alarm. The trial court suspended the sentences and placed Defendant on probation for a total of 165 days.

Defendant is a Level II offender for misdemeanor sentences. Defendant's most serious misdemeanor conviction was for assault inflicting serious injury, which is an A1 misdemeanor that carries a maximum punishment for a Level II offender of 75 days. N.C. Gen. Stat. § 15A-1340.23(c) (2007). Thus, the trial court could only impose consecutive sentences totaling twice the maximum sentence for assault inflicting serious injury, or 150 days. Accordingly, the trial court erred in imposing consecutive sentences totaling 165 days. This portion of the trial court's commitment is remanded for resentencing.

### D. Supervised Sentence for Probation

[4] In his final argument, Defendant contends that the trial court incorrectly placed him on supervised probation for 24 months without making a finding that the term of probation was necessary. The State also concedes that this portion of Defendant's sentence should be remanded.

Pursuant to N.C. Gen. Stat. § 15A-1343.2(d), "[u]nless the court makes specific findings that longer or shorter periods of probation are necessary, the length of the original period of probation for of-

fenders sentenced under Article 81B shall be . . . [f]or misdemeanants sentenced to community punishment, not less than six nor more than 18 months[.]" N.C. Gen. Stat. § 15A-1343.2(d) (2007). Here, the trial court entered consecutive judgments for assault inflicting serious injury, false imprisonment, and false fire alarm. The trial court suspended these sentences and placed Defendant on supervised probation for 24 months, to begin after he served his active sentence. However, the trial court did not make specific findings that a longer period of probation was necessary. Accordingly, this portion of Defendant's sentence is remanded for further findings pursuant to N.C. Gen. Stat. § 15A-1343.2.

NO ERROR in part, REMANDED in part.

Judges McGEE and STEELMAN concur.