An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA14-1100

Filed: 21 April 2015

Sampson County, Nos. 13 CRS 50318, 14 CRS 147

STATE OF NORTH CAROLINA

v.

JOHNNY WILLIAMS

Appeal by defendant from judgment entered 30 May 2014 by Judge W. Douglas Parsons in Sampson County Superior Court. Heard in the Court of Appeals 4 March 2015.

> *Attorney General Roy Cooper, by Assistant Attorney General Michael Bulleri, for the State.*

> *Appellate Defender Staples Hughes, by Assistant Appellate Defender Jillian C. Katz, for defendant-appellant.*

INMAN, Judge.

Johnny Williams ("defendant") appeals from judgment after a jury found him guilty of manufacturing methamphetamine, keeping and maintaining a dwelling house for keeping and using a controlled substance, trafficking in methamphetamine by manufacture, and trafficking in methamphetamine by possession. On appeal, defendant argues that the trial court erred by: (1) denying defendant's motion to suppress evidence obtained following an unlawful search of his home; (2) instructing

the jury on the theory of aiding and abetting on the charge of manufacturing methamphetamine; and (3) denying defendant's motion to dismiss the charge of maintaining a dwelling for keeping and using a controlled substance.

After careful review, we conclude that the trial court did not err.

**Background**

On 6 February 2013, Tessie Cashwell ("Tessie") called 911 and requested assistance from the Sampson County Sheriff's Office ("Sheriff's Office") to help her retrieve personal belongings from the home of defendant, Tessie's ex-boyfriend at the time.[1] Deputy Jerry Cashwell ("Cashwell")[2] and Agent Brandon Pope ("Pope") met Tessie at defendant's residence at 1881 Harnett Church Road in Roseboro. Defendant allowed both officers to enter his home and wait while Tessie collected her personal items.

Shortly thereafter, Captain Josuph Frischmann ("Captain Frischmann") and Lieutenant Rhonda Medlin ("Lieutenant Medlin"), also of the Sheriff's Office, arrived at defendant's residence. Captain Frischmann met Cashwell on the front porch and asked if defendant was inside. Cashwell said that he was, so Captain Frischmann walked into the home. Once inside, Captain Frischmann saw defendant and explained that he was there to investigate for the presence of drugs at the property.

---

[1] Tessie and defendant married on 14 March 2014.
[2] Tessie and Deputy Cashwell are not related.

Defendant informed Captain Frischmann that there were no drugs in the house but that he was "welcome to look." After pausing briefly, defendant pointed to a door down the hallway and said, "It's in there. I want them out." Captain Frischmann walked toward the door, announced his presence, and then opened the door to find a woman and man lying on top of a bed. After escorting the individuals into the living room, Captain Frischmann asked defendant to step outside to talk. He then presented defendant with a consent form to search the premises, which defendant read and signed.

A search of the house revealed a number of controlled substances and related paraphernalia, to wit: (1) one mason jar containing 310 grams of liquid methamphetamine; (2) one plastic bag containing an unspecified amount of a powder methamphetamine and pseudoephedrine mixture; (3) glass, plastic, and aluminum foil smoking devices; (4) a marijuana cigarette; and (5) multiple plastic baggies and rolling papers. Additionally, the search yielded several items consistent with the manufacture of methamphetamine, including: (1) a Pyrex dish with methamphetamine residue; (2) a razor blade coated with an off-white colored substance; (3) blue shop paper towels containing white residue, which Captain Frischmann testified were typically used as filters in the methamphetamine manufacturing process; (4) a one-gallon can of acetone; (5) one can of Coleman fuel; (6) a 50-pound bag of ammonium nitrate fertilizer; (7) a two-pound bottle of sodium

hydroxide crystal drain opener; (8) camouflage netting; and (9) a lighting system. A few hundred yards away from the house, officers found four plastic trash bags containing a curled-up white tube, an empty container of drain cleaner, plastic bottles containing white sludge and green liquid, and multiple pieces of burnt aluminum foil.

At trial, defendant moved to suppress all evidence gained from the search. He argued that Captain Frischmann did not have consent to enter the house because his purpose was to investigate narcotics, whereas Cashwell and Pope were there to help Tessie collect her personal items. Thus, defendant argued that because the subsequent search stemmed from Captain Frischmann's unlawful entrance, all evidence gained from the search should have been excluded. The trial court denied defendant's motion. In its written order, the trial court concluded that defendant's consent to the search of his home was voluntary, intelligent, and knowing, and that the evidence obtained pursuant to the search had not been tainted.

At the close of the State's evidence, the trial court granted defendant's motion to dismiss the charge of conspiracy. Over defendant's objection, the trial court instructed the jury that it could convict defendant of the crime of manufacturing methamphetamine if it found that he aided or abetted any other individual in that crime. The jury found defendant guilty of manufacturing methamphetamine, maintaining a dwelling for the purpose of keeping and using a controlled substance,

and trafficking in methamphetamine by manufacture and possession. Defendant gave notice of appeal in open court.

## Discussion

## I. Motion to Suppress

Defendant first argues that the trial court erred by denying his motion to suppress. He contends that Captain Frischmann's initial entry into the home was illegal under the Fourth Amendment, and therefore, all evidence obtained from the subsequent search should have been excluded as fruit of the poisonous tree. Although we agree that Captain Frischmann's entry was unlawful, the evidence was not sufficiently tainted to warrant application of the exclusionary rule.

As a threshold matter, the State contends that defendant has failed to preserve this issue on appeal because: (1) the motion to suppress was improperly brought under N.C. Gen. Stat. § 15A-975 (2013); (2) the motion was not timely; and (3) defense counsel failed to support the objection to the admission of the challenged evidence on the grounds stated in his brief. We disagree.

Defense counsel claimed that, in pretrial discovery, he was informed by the State that Captain Frischmann arrived at defendant's house contemporaneously with officers Cashwell and Pope, with no indication that Captain Frischmann had a separate purpose for being at the scene. Defense counsel entered his motion to suppress immediately after Captain Frischmann testified on cross-examination that

he walked into the home with an investigative purpose after officers Cashwell and Pope were already at the scene. Under section 15A-975(a), a defendant may move to suppress evidence during trial if "the defendant did not have reasonable opportunity to make the motion before trial[.]" Here, defendant had no reasonable opportunity to enter the suppression motion before trial, because he could not have known that Captain Frischmann entered defendant's home with a different purpose than officers Cashwell and Pope until that information was elicited during testimony. Furthermore, defense counsel moved to suppress any evidence found in the subsequent search on the ground that such evidence was tainted by Captain Frischmann's allegedly unlawful entry. This is the same argument that defendant now presents on appeal. Accordingly, we conclude that defendant's motion was timely brought and sufficiently stated the grounds upon which it was entered. *See generally State v. Roper*, 328 N.C. 337, 361, 402 S.E.2d 600, 614 (1991). The State's argument that this issue has not been preserved for appellate review is overruled.

In our review of trial court orders addressing motions to suppress, "the trial court's findings of fact are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting. This Court must not disturb the trial court's conclusions if they are supported by the [trial] court's factual findings. However, the trial court's conclusions of law are fully reviewable on appeal." *State v. Harwood*, 221

N.C. App. 451, 454-55, 727 S.E.2d 891, 895-96 (2012) (internal quotation marks

omitted).

Here, the trial court entered a written order denying defendant's motion to

suppress, which contained the following factual findings:

> 1. The officers were at the location of the search, the defendant's house, as a result of a legitimate call to the 911 center for assistance;
>
> 2. The defendant was not placed into custody at any time prior to or during the search of the premises;
>
> 3. The defendant was presented with a voluntary consent to search form by the officers, which was explained to him, and executed by the defendant prior to any search of the premises;
>
> 4. There were no threats, inducements or promises made to the defendant by any law enforcement officer;
>
> 5. The defendant voluntarily, intelligently, and knowingly waived his Fourth Amendment rights, and consented to a search of his premises.

Based on these findings, the trial court concluded that: (1) the consent form signed

by defendant was valid and was given voluntarily, intelligently, and knowingly; and

(2) none of the evidence obtained pursuant to the search was tainted.

Defendant challenges the trial court's determination that he was presented

with the consent form prior to any search of the residence.[3]  Specifically, he contends

---

[3] The trial court included this determination in its findings of fact, presumably based on the evidence showing that a full investigative search of the premises did not occur until after defendant signed the

that when Captain Frischmann walked through his front door with the subjective intent to investigate drug activity, he was not granted the same consent previously given to officers Cashwell and Pope, whom defendant allowed to enter his home for the specific purpose of assisting Tessie gather her belongings. Therefore, defendant argues that because Captain Frischmann entered his home without first obtaining a warrant or receiving consent, in the absence of exigent circumstances, his entrance constituted an unlawful search under the meaning of the Fourth Amendment. We agree.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. amend. IV. "[G]enerally speaking, an intrusion into a residence is a search within the meaning of the Fourth Amendment, for physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *State v. Barnes*, 158 N.C. App. 606, 610, 582 S.E.2d 313, 317 (2003) (quotation marks omitted). Furthermore, "[i]t is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are

---

consent form. However, defendant argues that Captain Frischmann's entry, in and of itself, was a "search" under the meaning of the Fourth Amendment. Because this question requires the application of legal principles, we will consider the trial court's finding to also be an implicit conclusion of law that Captain Frischmann's entry did not constitute a search, which we will review *de novo*. *See State v. Sparks*, 362 N.C. 181, 185, 657 S.E.2d 655, 658 (2008) ("In distinguishing between findings of fact and conclusions of law, as a general rule, . . . any determination requiring the exercise of judgment or the application of legal principles is more properly classified a conclusion of law." (internal quotation marks omitted)).

presumptively unreasonable." *State v. Smith*, 346 N.C. 794, 798, 488 S.E.2d 210, 213 (1977) (internal quotation marks omitted); *see also Payton v. New York*, 445 U.S. 573, 590, 63 L. Ed. 2d 639, 653 (1980) ("[T]he Fourth Amendment has drawn a firm line at the entrance to the house.").

However, it is well established that an exception to this rule exists when the search of a home is based upon lawful consent. *See State v. Stone*, 179 N.C. App. 297, 304, 634 S.E.2d 244, 249 (2006). Consent refers to "a statement to the officer, made voluntarily . . . giving the officer permission to make a search." N.C. Gen. Stat. § 15A-221(b) (2013). "[C]onsent . . . must be freely and intelligently given, without coercion, duress or fraud, and the burden is upon the [S]tate to prove that it was so, the presumption being against the waiver of fundamental constitutional rights." *State v. Vestal*, 278 N.C. 561, 578-79, 180 S.E.2d 755, 767 (1971). The suspect may limit the scope or duration of a consent search. "The scope of a valid consent search is measured against a standard of objective reasonableness where the court asks 'what would the typical reasonable person have understood by the exchange between the officer and the suspect?'" *State v. Hagin*, 203 N.C. App. 561, 564, 691 S.E.2d 429, 432 (2010) (quoting *Florida v. Jimeno*, 500 U.S. 248, 251, 114 L. Ed. 2d 297, 302 (1991)).

Here, evidence presented at trial showed that officers Cashwell and Pope arrived at defendant's residence in response to a 911 call from Tessie requesting

police assistance while she collected her personal belongings. Cashwell arrived first at the scene, followed closely by Pope—both of whom testified that they reported to defendant's home in response to the request for domestic assistance. When he first approached the front door, Cashwell explained to defendant that the officers were there to assist Tessie, and defendant allowed them to enter his home while Tessie gathered her personal items.

Shortly thereafter, Captain Frischmann walked in through the front door, found defendant, and stated that his purpose for being inside defendant's home was to search for the presence of narcotics. It is undisputed that Captain Frischmann did not knock at the door or ask permission to enter defendant's home—he simply walked in.

Under these circumstances, we believe that Captain Frischmann's entry constituted an unlawful search. He crossed the threshold of defendant's home, which our Courts have recognized as "the chief evil against which the wording of the Fourth Amendment is directed." *Barnes*, 158 N.C. App. at 610, 582 S.E.2d at 317 (quotation marks omitted). And under the analysis set out in *Jimeno*, 500 U.S. at 251, 114 L. Ed. 2d at 302, this search exceeded the scope of consent defendant gave to Cashwell and Pope. The nature of the initial consent was for Cashwell and Pope to stand by while Tessie collected her belongings. Defendant did not give the officers consent to search—he merely allowed them to wait inside his home until Tessie was ready to

leave. Therefore, when Captain Frischmann walked in through defendant's front door searching for the presence of narcotics, he was inherently exceeding the scope of that consent. The nature of Captain Frischmann's presence in the home was investigative, not supportive. Based on this distinction, we conclude that no reasonable person would have understood defendant's approval of Cashwell and Pope waiting for Tessie inside his living room to include consent for a third officer to show up later, walk in unannounced, and search for drugs. Because "[t]he scope of the search can be no broader than the scope of the consent," *State v. Jones*, 96 N.C. App. 389, 397, 386 S.E.2d 217, 222 (1989), Captain Frischmann's initial entry into defendant's home was unlawful under the Fourth Amendment.

Given the illegality of Captain Frischmann's entry, we must determine whether that Fourth Amendment violation tainted the subsequent consent search of the home. It is true that "[e]vidence that is discovered as a direct result of an illegal search or seizure is *generally* excluded at trial as fruit of the poisonous tree[.]" *State v. Jackson*, 199 N.C. App. 236, 244, 681 S.E.2d 492, 497 (2009) (emphasis added). However,

> [w]e need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.

*Wong Sun v. United States*, 371 U.S. 471, 487-88, 9 L. Ed. 2d 441, 455 (1963). The United States Supreme Court has articulated three nonexclusive factors that courts should consider in determining whether the taint from an illegal search has dissipated: (1) the time elapsed between the Fourth Amendment violation and the procurement of consent or confession; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. *Brown v. Illinois*, 422 U.S. 590, 603-04, 45 L. Ed. 2d 416, 427 (1975). "[T]he *Brown* test does not require that each of the factors set forth be resolved in favor of the Government," *U.S. v. Seidman*, 156 F.3d 542, 549 (4th Cir. 1998) (quotation marks omitted), but rather, this analysis requires a "careful sifting of the unique facts and circumstances of each case," *U.S. v. Wellins*, 654 F.2d 550, 554 (9th Cir. 1981) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 36 L. Ed. 2d 854 (1973)).

The United States Court of Appeals for the Fourth Circuit's analysis in *Seidman* is persuasive here. *See State v. Wheeler*, 202 N.C. App. 61, 67, 688 S.E.2d 51, 55 (2010) (noting that decisions from the Fourth Circuit are not binding on this Court, but may be utilized as persuasive reasoning). In *Seidman*, the defendant was accused of embezzling funds from a labor union for which he served as Comptroller. *Seidman*, 156 F.3d at 544. The police arranged for Ronald Schoop ("Schoop"), one of the defendant's alleged co-conspirators, to speak with the defendant at his home while wearing an electronic recording device. *Id.* at 545. Schoop knocked on the

defendant's door repeatedly, but no one answered, so he opened the unlocked door and walked in. *Id.* The defendant was standing in a hallway near the door and led Schoop to the kitchen where the two talked for the next forty-five minutes. *Id.* At trial, the prosecution sought to admit incriminating statements made by the defendant during this conversation, but the defendant moved to suppress those statements as resulting from Shoop's unlawful entry into the home. *Id.* at 547.

On appeal, the Fourth Circuit court assumed, but did not decide, that Schoop's entrance was unlawful under the Fourth Amendment. *Id.* at 549. However, in conducting the analysis set out by the United States Supreme Court in *Wong Sun* and its progeny, the court held that the taint created by the unlawful entry was purged by independent acts of the defendant. *Id.* at 550. Although the time between the unlawful entry and subsequent conversation was short, the court determined that the second and third *Brown* factors weighed against suppression of the incriminating statements. The court reasoned:

> Almost immediately after Schoop entered the home, any taint arising from Schoop's entry was attenuated by Seidman's consent to the conversation. Shortly after Schoop opened the door to Seidman's house, Seidman shut the front door behind Schoop, and Seidman motioned him into the kitchen. These intervening acts indicated Seidman's willingness to engage in a conversation with Schoop. More importantly, shutting the door behind Schoop and motioning him into the kitchen were independent acts of free will by Seidman. . . . Seidman never asked Schoop to leave.

> The third [*Brown*] factor also weighs against suppression. . . . The degree of coercion resulting from the police officers' illegal acts in *Wong Sun* and *Brown v. Illinois* simply was not present here. . . . Schoop never made any threats to Seidman or exerted any force towards him. Seidman now claims on appeal that he did not ask Schoop to leave because Schoop intimidated him. . . . With the exception of Seidman's own testimony, there is simply no evidence to suggest that Schoop intimidated Seidman.

*Id.* at 549-50 (citations omitted).

In this case, like in *Seidman*, Captain Frischmann's unlawful entry was "at worst a minor and technical invasion" of defendant's rights, *Seidman*, 156 F.3d at 549, and defendant's own independent acts of free will sufficiently attenuated the taint from the unlawful entry to justify the trial court's denial of defendant's motion to suppress. As soon as Captain Frischmann walked into the home, he spoke with defendant, apprised him of his purpose for being there, and asked to search the residence for the presence of drugs. Defendant responded by saying that there were no drugs in the house, but that the officers were "welcome to look." Defendant then paused, pointed to a bedroom down the hallway, and told Captain Frischmann, "It's in there. I want them out." Defendant's immediate oral consent to search and request for Captain Frischmann to remove the individuals from a bedroom in his residence indicated a willingness on defendant's behalf to allow Captain Frischmann to carry out his duties as an investigative officer. It is undisputed that defendant never asked Captain Frischmann to leave the home or stop his search once it began. Defendant

even helped Captain Frischmann find incriminating evidence by telling him that the acetone was kept in the freezer. As in *Seidman*, the violation of defendant's Fourth Amendment rights in this case "pales in comparison" to cases where the taint of an unlawful search or seizure was not sufficiently attenuated. *See, e.g.*, *Wong Sun*, 371 U.S. at 486, 9 L. Ed. 2d at 454 (holding that where multiple officers broke open the door of the defendant's home and almost immediately handcuffed and arrested him, the defendant's incriminating statements were not the result of free will under the circumstances sufficient to purge the taint of the unlawful entrance); *Brown*, 422 U.S. at 592, 604-05, 45 L. Ed. 2d at 421, 428 (holding that the defendant's incriminating statements were not the result of free will where they were made after officers broke into his home to conduct an illegal search and arrested the defendant while pointing their weapons at him). Defendant here consented to the search of his home twice—once orally after Captain Frischmann's initial entry and again in writing after being presented with and reading a consent form shortly after Captain Frischmann removed the individuals from the back bedroom (at defendant's request). There is no evidence that defendant was arrested, intimidated, or coerced in any way prior to giving either form of consent.

Accordingly, based on the factors enunciated by the United States Supreme Court in *Wong Sun* and *Brown*, we conclude that the search of defendant's residence and the evidence gained therefrom did not result from the exploitation of Captain

Frischmann's unlawful entry into the home. Any taint arising from the initial entry was purged by defendant's independent acts of free will and his voluntary, knowing, and intelligent consents to search—both oral and written. Therefore, we conclude that the trial court's denial of defendant's motion to suppress was free from error.

## II. Aiding and Abetting Instruction

Defendant next argues that the trial court erred by instructing the jury on aiding and abetting as a theory of criminal liability for the charge of manufacturing methamphetamine. We disagree.

"Properly preserved challenges to the trial court's decisions regarding jury instructions are reviewed *de novo*, by this Court. But jury instructions are not reviewed in isolation." *State v. King*, __ N.C. App. __, __, 742 S.E.2d 315, 319 (2013) (internal quotation marks and citation omitted).

> This Court reviews jury instructions contextually and in its entirety. The charge will be held to be sufficient if it presents the law of the case in such manner as to leave no reasonable cause to believe the jury was misled or misinformed. The party asserting error bears the burden of showing that the jury was misled or that the verdict was affected by [the] instruction. Under such a standard of review, it is not enough for the appealing party to show that error occurred in the jury instructions; rather, it must be demonstrated that such error was likely, in light of the entire charge, to mislead the jury.

*State v. Blizzard*, 169 N.C. App. 285, 296–97, 610 S.E.2d 245, 253 (2005) (citation, quotation marks, and ellipses omitted). "It is generally error, prejudicial to

defendant, for the trial court to instruct the jury upon a theory of a defendant's guilt which is not supported by the evidence." *State v. Brown*, 80 N.C. App. 307, 311, 342 S.E.2d 42, 44 (1986).

Aiding and abetting is a theory of criminal liability, not a substantive offense. *See State v. Fuller*, 179 N.C. App. 61, 67, 632 S.E.2d 509, 513 (2006). A jury instruction on aiding and abetting is proper where there is evidence: "(1) that the crime was committed by another; (2) that the defendant knowingly advised, instigated, encouraged, procured, or aided the other person; and (3) that the defendant's actions or statements caused or contributed to the commission of the crime by the other person." *State v. Baskin*, 190 N.C. App. 102, 111, 660 S.E.2d 566, 573 (2008) (quotation marks omitted).

We conclude that the State presented sufficient evidence of all three elements here to support the trial court's instruction on aiding and abetting for the charge of manufacturing methamphetamine. Defendant told officers at the scene that an acquaintance of his named Norman Ray Faircloth ("Faircloth") was running a methamphetamine lab at a house on Hollandtown Road. Captain Frischmann testified that defendant was "nervous" during the search of his residence, and every time Captain Frischmann got near a piece of evidence, defendant "would come running in and tell [him] that [Faircloth] was cooking methamphetamine." When asked about the methamphetamine manufacturing activities at Hollandtown Road,

defendant told Captain Frischmann that "[t]hey took over my house." Defendant also told the officers that he allowed Faircloth's wife, Monica Dawson ("Dawson"), and her twelve-year-old daughter to sleep in his house for the previous week because he feared that they were unsafe at Faircloth's residence.

Defendant testified that he had witnessed Faircloth cook methamphetamine in the past, and that he allowed Faircloth to come "in and out" of defendant's residence in the week leading up to the search of his home. Defendant claimed that his relationship with Faircloth was one built on deception, and that his intention behind allowing Faircloth to spend time in his residence was to gather information before informing the police about Faircloth's drug activity. However, Captain Frischmann testified that police had been investigating Faircloth for over a year before the search of defendant's residence, and defendant provided "very limited information" as to Faircloth's methamphetamine production. The only information defendant gave Captain Frischmann before the search was that Faircloth was cooking methamphetamine, which was "common knowledge" according to Captain Frischmann. Furthermore, defendant testified that Dawson, his houseguest, actively assisted Faircloth in the manufacture of methamphetamine by washing out cookware and plastic dishes and pouring liquid methamphetamine into a filter during the manufacturing process. A Pyrex dish with methamphetamine residue, 310 grams of liquid methamphetamine, and blue shop paper towels containing white residue,

sometimes used as filters in this endeavor, were all found in defendant's residence. Defendant also stated that he had been allowing Faircloth and Dawson to use his vehicle during the week leading up the search, and that defendant had helped Faircloth unload a blue container with a bag of fertilizer from the trunk of his car. When asked by Captain Frischmann what materials were inside the blue container, defendant replied "meth lab items."

In sum, the State presented substantial evidence that Faircloth and Dawson were engaged in the manufacture of methamphetamine, and that, at the very least, defendant allowed them to use his home and his vehicle to carry that crime to fruition. Therefore, each of the elements needed to support a jury instruction on aiding and abetting for the crime of manufacturing methamphetamine were satisfied. *See Baskin*, 190 N.C. App. at 111-12, 660 S.E.2d at 573. Defendant's argument is overruled.

### III. Maintaining a Dwelling

Defendant's final argument on appeal is that the trial court erred by denying his motion to dismiss the charge of maintaining a dwelling for the purpose of keeping and using a controlled substance. We disagree.

In ruling on a motion to dismiss based on insufficiency of evidence, the trial court must determine whether there is substantial evidence of each element of the offense charged. *See State v. Bullard*, 312 N.C. 129, 160, 322 S.E.2d 370, 387 (1984).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 78–79, 265 S.E.2d 164, 169 (1980). When reviewing the evidence, the trial court must consider even incompetent evidence in the light most favorable to the prosecution, granting the State the benefit of every reasonable inference. *State v. Brown*, 310 N.C. 563, 566, 313 S.E.2d 585, 587 (1984). Any contradictions or discrepancies in the evidence should be resolved by the jury. *Id.*

Under N.C. Gen. Stat. § 90-108(a)(7) (2013) it is unlawful for any person to "knowingly keep or maintain any . . . dwelling house, building, . . . or any place whatever, which is resorted to by persons using controlled substances . . . or for the purpose of using such substances, or which is used for the keeping or selling of the same[.]" Payment of rent is sufficient to satisfy the requirement that the defendant "keep or maintain" the building or house in question. *See State v. Bowens*, 140 N.C. App. 217, 221-22, 535 S.E.2d 870, 873 (2000). "The determination of whether a vehicle, or a building, is used for keeping or selling controlled substances will depend on the totality of the circumstances." *State v. Mitchell*, 336 N.C. 22, 34, 442 S.E.2d 24, 30 (1994). This Court has previously held that

> [t]he evidence showing that defendant resided in the house, that she was cooking dinner, and that she possessed cocaine and materials related to the use and sale of cocaine, is sufficient to allow conviction under G.S. 90-108(a)(7) for maintaining a dwelling used for the keeping or selling of controlled substances.

*State v. Rich*, 87 N.C. App. 380, 384, 361 S.E.2d 321, 324 (1987).

Here, it is undisputed that: (1) defendant paid rent to reside at the property in question; and (2) the following were found in defendant's residence: 310 grams of liquid methamphetamine; one plastic bag containing an unspecified amount of methamphetamine; glass, plastic, and tinfoil smoking devices; a marijuana cigarette; and rolling papers. Considered in the light most favorable to the State, this evidence was sufficient to show that defendant possessed controlled substances and related materials in the home for which he was a rent-paying tenant. Therefore, the State presented substantial evidence satisfying all elements of section 90-108(a)(7), and the trial court did not err by denying defendant's motion to dismiss this charge. *See, e.g.*, *State v. Cowan*, 194 N.C. App. 330, 337, 669 S.E.2d 811, 817 (2008).

**Conclusion**

Because defendant's independent acts of free will purged his consent to search from the taint of Captain Frischmann's unlawful entry into his home, the trial court did not err by denying defendant's motion to suppress. Additionally, the trial court's instruction on aiding and abetting and denial of defendant's motion to dismiss the charge of maintaining a dwelling were free from error.

NO ERROR.

Judges ELMORE and GEER concur.

Report per Rule 30(e).